THE H. D. WATTS COMPANY *vs.* AMERICAN BOND
AND MORTGAGE COMPANY.

SAME *vs.* WILLIAM J. MOORE.

Suffolk. January 21, February 3, 1927. — July 14, 1927.

Present: RUGG, C.J., BRALEY, CROSBY, PIERCE, & WAIT, JJ.

*Unlawful Interference. Release. Contract,* Construction. *Damages,* In tort, Speculative, Conjectural. *Evidence,* Relevancy, Competency.

Upon a review of all the evidence and offers of proof at the trial of two actions of tort by a corporation, respectively against a bonding company and against its president, for damages resulting from the defendants' unlawfully interfering with a contract in writing of the plaintiff with a hotel corporation for the construction of an apartment hotel and persuading and coercing the hotel corporation to break such contract and to enter into a contract for the construction of the building with another construction corporation which was directly or indirectly controlled by the defendants, it was *held,* that
(1) Such evidence introduced and offered would warrant a finding

that the defendants wrongfully induced the hotel corporation to break its contract with the plaintiff;

(2) If the jury found, as they were warranted in doing on the evidence, that the object of the individual defendant was to obtain for the second construction corporation, in which he was financially interested, the benefit of the plaintiff's contract, he might be found liable;

(3) The plaintiff was not precluded as a matter of law from maintaining the action by reason of the fact that, after months of urging on the part of the defendants and of protesting on the part of the plaintiff's officer, insisting upon its rights, the plaintiff by its officer was induced to sign a document in which the hotel corporation, in consideration of a cancellation by the plaintiff of its contract, agreed to pay the plaintiff a certain sum, the agreement providing, "payments will be made at different times during the course of construction . . . in sums of not less than $5,000 and that an agreement will be entered into at some later date between the . . . [hotel corporation] and the . . . [plaintiff], which agreement shall be acknowledged by the . . . [defendant corporation]. Said . . . [defendant corporation] is to agree in writing to the payment of said notes out of the fund due the . . . [hotel corporation] at such time as called for"; which agreement had not been fulfilled in any particular: such document by its wording disclosed an intention on the part of the plaintiff to stand on its rights under its contract with the hotel corporation until the payment of a consideration for the release was secured by an instrument to which the defendant corporation was a party, and, therefore, did not in and of itself constitute a release or a cancellation of the contract;

(4) Certain testimony by the clerk of the hotel corporation relating to adjustments proposed to be carried through by him and by a vice-president of that corporation properly was excluded, it not appearing that either of them had authority to represent the corporation;

(5) If the plaintiff recovered, the measure of its damages was limited to the actual value of the contract of which the defendants deprived it, as viewed in the light of the attendant circumstances of which the jury could find the defendants had knowledge; he was not entitled to speculative or conjectural profits or losses;

(6) On the question of damages, evidence was admissible as to what happened to the project of the building of the apartment hotel after the contract was given to the second construction company.

Two ACTIONS OF TORT, in the second count of the declaration of each of which, as amended, the plaintiff alleged in substance "that it had entered into a contract with The Chatham, Inc., a Massachusetts corporation, for the erection of a building, and that the defendant, with full knowledge of such contract, unlawfully and maliciously induced, persuaded and coerced The Chatham, Inc., to break such contract, and, enter into a contract to erect the same building by Longacre Engineering and Construction Company, Inc., a corporation

directly or indirectly controlled by the defendant, whereby the plaintiff lost the benefit of its contract." Writs dated, respectively, July 31 and September 4, 1923.

The actions were tried together in the Superior Court before *Walsh*, J. Material evidence and exceptions by the plaintiff are stated in the opinion. At the close of the evidence, the judge ordered verdicts for the defendants. The plaintiff alleged exceptions.

*H. R. Bygrave*, for the plaintiff.

*E. R. Anderson*, (*R. B. Owen* with him,) for the defendants.

BRALEY, J. The declaration in each of these two actions of tort, which were tried together, contained two counts, the first of which was waived. The answer in each case was a general denial. They are before us on exceptions saved by the plaintiff to the admission and exclusion of evidence, at the close of which and subject to the plaintiff's exception, the trial judge ordered a verdict for the defendants. The jury would have been warranted in finding the following facts:

The plaintiff, a corporation organized under the laws of Maryland, was engaged in the construction of buildings. On July 25, 1922, it entered into an agreement with The Chatham, Inc., a corporation organized under the laws of this Commonwealth, to build for it "The Chatham Apartment Hotel, Brookline, Massachusetts," according to plans and specifications furnished by its architect, a copy of which "as finally revised, modified and determined upon," was furnished to the plaintiff, who shortly thereafter visited the proposed building site, "located the building lines, staked out the property, made a survey to find the grades and the amount of excavation to be done, erected a workmen's shack, put up batter boards and cut away the shrubbery to get the lines through and placed the plaintiff's general superintendent on the job." On August 18 and 19, 1922, Harry D. Watts, president of the H. D. Watts Company, together with E. R. Grabow, then president of The Chatham, Inc., and one Ivor B. Clark, a broker, was in Chicago, Illinois, where he was introduced to William J. Moore, president of the American Bond and Mortgage Company, as "the builder of the Chatham." In the presence of Watts,

Moore, Clark and Grabow discussed the details of a proposed mortgage loan which resulted in calling in an engineer of the American Bond and Mortgage Company, with whom Watts was asked to verify certain physical aspects of the proposed building. A discussion arose as to the amount of the contractor's profit, and Moore said, "I am only going to allow $150,000 . . . to be paid out of the first mortgage loan," to which either Clark or Grabow replied "Well, Watts already has a $260,000 fee in his contract. How are you going to overcome that?" Watts remarked that it was immaterial to him whether the $150,000 came out of the first mortgage or where, as he had a contract which gave him a $260,000 fee from the Chatham. The plaintiff's contract was produced, handed to Moore, who read it, and Moore told Watts that he would have to procure a million dollar bond guaranteeing the performance of his contract, which Watts said he was ready to produce.

On August 30, 1922, another meeting took place in Boston between the defendant Moore and Watts, there being present a brother and two sons of Moore, all officials of the American Bond and Mortgage Company, Ivor B. Clark, and the president, clerk, treasurer and a director of The Chatham, Inc., all of whom, after visiting the site of the proposed building, went to a hotel in Swampscott and, with the exception of Watts and Clark, went into conference. Later Watts was called in, and Moore pointed out some apparently conflicting statements in the contract signed by Watts with the "papers that were signed," in Swampscott, and also alluded to the subject of waiver of liens by the Watts Company and its subcontractors, the Watts Company's fee, and the making of an appraisal of the building by Watts. One of Moore's sons suggested that he would send to Watts a form of contract containing a provision for the waiving of liens by sub-contractors and also a copy of the "underwriting agreement that was executed that night between the American Bond and Mortgage Company and The Chatham, Inc.," for his use in the procurement of a bond from the surety company. This underwriting agreement designated The Chatham, Inc., as "the Owner," and the American Bond and

Mortgage Company as "the Broker." It stated the amount of the broker's commission "for all its services herein agreed by it to be performed exclusive of disbursement by it to be made and enumerated herein, the sum of twelve and one-half per centum of the face principal amount of each and all of the above mentioned bonds (exclusive of interest thereon) and the amount of any accrued interest on said bonds which said Broker may procure from any purchaser or purchasers thereof." It also contained the statement that the General Contractor's profit was to be not over $150,000.

Shortly after the middle of September, Watts, accompanied by Clark, saw Moore at his New York office, and was told by Moore that his contract seemed higher than it should be and asked him to talk the matter over with one Thomas, an officer of the Longacre Company, to see if he couldn't "reduce . . . [his] cost." This was done and Watts reported the result, to the effect that they "were not very far apart on the cost," and offered to show Moore how they had "gotten together." Moore refused to listen to these details and said "Mr. Tobey and Mr. Clark know my wishes in this matter, and what has got to be done, if I am going any further with this deal. If you have got anything more to say, you had better say it to them"; that "Clark and Tobey were handling this matter for him, and I must take it up with them." About the last of September Watts again went to New York and had a talk with Clark. Subject to the exception of the defendants, Watts was permitted to testify that "Mr. Clark told me, . . . that I must work out some sort of a contract that would limit that cost, in order to satisfy Mr. Moore." During this interview Watts produced two forms of contractor's bonds and a draft copy of a proposed new contract which he gave to Clark, after which they went to see Moore and had a talk with him; Moore took the papers and said "I will look them over." In reply to Watts's question—whether or not it was "feasible to open his first mortgage and come along *pro rata* in his payments" because the secondary financing was not in such shape that it could all be paid in, Moore said that he would think it over

and advise Clark. "At that time he [Moore] was not disposed to do it." A day or two afterward Watts and Clark again went to Moore's office, and, as Clark went into Moore's private office, Watts saw him hand to Moore a "blue wrapped contract," which was the one under discussion, and also a letter. Moore first read the contract and then opened the envelope and read the letter. Clark and Moore talked five minutes or more, and when Clark came out, he and Watts left the building together. The defendants objected to Watts testifying what Clark said to him, and upon its exclusion Watts offered to prove that Clark said "Watts, it looks pretty black for Grabow, and it looks black for you too. Moore will not go on with this underwriting unless the Longacre does the work." When asked to testify to the conversation between himself and Clark on October 9 or 10, 1922, which, upon objection by the defendants, the trial judge excluded, the following offer of proof was made: "He said he wanted to know what I would take to cancel my contract, that Mr. Moore wouldn't go ahead with the deal unless the Longacre had the contract, and I told him that I was in my attorney's office then, and would get on the extension 'phone while he talked to Mr. Bartlett. He said that he was talking from Tobey's office; they had just been in conference with Moore, and they had to get rid of my contract, or there would be no deal. He asked me what I would take for it. Mr. Bartlett talked to me through the 'phone with them listening and stated $150,000. Tobey came in on the conversation and stated that it was too much; that Moore wouldn't stand for it; if I got in a more reasonable frame of mind, to let them know." Under like circumstances Watts was inquired of concerning a meeting between himself, Clark and Tobey at the latter's office in New York October 13, 1922, and offered to prove that the conversation between them was as follows: "Tobey said to me when I first got there that he wanted me to make him a proposition to settle this contract, because Moore wouldn't go ahead without Longacre, and I told him that the best I would do would be the full amount of my profit; that it was foolish for them to let Moore sway them this way,

because I could finance the deal. I had been to my bank; I had been to an insurance company, and they could save probably half a million dollars in commissions that the American Bond and Mortgage Company were getting, to finance this with the insurance company, and getting my subs to carry their proportion, with me taking Tobey's underwriting for $300,000, and have more money than they needed, especially as the furniture people were going to take fifty per cent in stock. Clark and Tobey both said that they were going to deal with nobody but the American Bond and Mortgage in this deal, that it was foolish for me to make any such suggestion. Then they offered me $25,000. Then they got it up to $30,000, and Clark said he would have to go to report to Moore; that he had an appointment with him at two o'clock, and if I wanted to consider this proposition, he was going down to his office and I could see him there after two o'clock, which I did. Then I went to Clark's office with Riddle and Byrnes [director and clerk respectively of The Chatham, Inc.,] and Clark. Finally we drew up a paper. Well, then I signed it and Byrnes signed it for The Chatham, Inc., and I reached for my copy, and Clark said, 'Wait a minute,' and called Moore, and said, 'This is all right.' He called his stenographer to get Mr. W. J. Moore on the 'phone, and there was a telephone conversation. And he said 'Well, Mr. Moore, I have made a settlement with Watts on this thing, and we have only got to guarantee $25,000,' and he handed me my copy of the paper, and then I left." As a result of this conversation, on the same date, Watts, as president of the H. D. Watts Company, signed a paper in the form of a letter addressed to The Chatham, Inc., which embodied the terms agreed upon for the cancellation of his contract of July 25, 1922, which was indorsed "Accepted: The Chatham, Inc. By Clifford H. Byrnes, Attorney," the principal features of which were that The Chatham, Inc., agreed to pay to the H. D. Watts Company in consideration for cancelling his contract with it, $25,000, "payments will be made at different times during the course of construction . . . in sums of not less than $5,000. and that an agreement will be entered into at some later date between

the Chatham, Inc., and the H. D. Watts Company, which agreement shall be acknowledged by the American Bond and Mortgage Company. Said American Bond and Mortgage Company is to agree in writing to the payment of said notes out of the fund due the Chatham, Inc., at such time as called for." The letter also stipulated that Watts personally agreed to return 1,600 shares of The Chatham, Inc., common stock without any additional payment to him as an individual or to the company, and in addition to the $25,000, it was understood that Watts was to receive "out of the commission paid by the Chatham, Inc., to Wm. A. White & Sons the sum of $5,000. making a total of $30,000. that I am to receive in consideration of the cancellation of the aforesaid mentioned contract." In no particular was this agreement ever fulfilled. The defendants objected to, and the trial judge excluded, the introduction of evidence as to the attitude of The Chatham, Inc., in the matter, and Watts offered to prove that "Mr. Byrnes said that he had several talks with Tobey and Clark, and if I didn't take this settlement it meant that they would lose all that they had put in, and everybody else would, that the deal would fall through. They also said that they would get me $20,000 worth of the preferred stock from Parker, Thomas and Rice. They said they would attempt to get a ratification of this settlement so that the agreement could be drawn cancelling the contract, and to try and put these terms through and let me hear from them. What was said about the American Bond and Mortgage Company was that they were going to get a guaranty from the American Bond and Mortgage Company for $25,000 and from William A. White and Sons a guaranty of $5,000."

Watts valued his contract of July 25, 1922, as $350,000, which included a fee of $260,000 and loss of advertisement and prestige.

On December 9, 1922, Byrnes was succeeded as clerk of The Chatham, Inc., by one Davison, a practising attorney in Boston, who also became local counsel for the American Bond and Mortgage Company in September of 1924. Davison produced at the trial the books and papers of The

Chatham, Inc., which showed the original capitalization to be $1,250,000 of preferred stock and 10,000 shares without par value, 9,997 of which were issued to Riddle for his services, one share issued to him as director, and one share each issued to one Seibert and one Carroll, for which they each paid $1. The directors of The Chatham, Inc., at a meeting held November 9, 1922, by vote directed the treasurer to pay to William A. White and Sons or their nominees, "a fee of $32,000 for and upon the execution of a First Mortgage bond issue in the sum of $2,700,000." It also was unanimously voted that, "in view of the negotiations at present pending with respect to the proposed mortgage on the property of this Company, in connection with which it is contemplated a contract for the construction of the proposed apartment hotel will be made with the Longacre Engineering and Construction Company, Inc., the treasurer be and hereby is authorized to make such arrangement with the H. D. Watts Company for the cancellation and discharge of any liability of this Company to the H. D. Watts Company by reason of any negotiations or agreements with respect to the construction of such proposed apartment hotel as the treasurer may deem advisable and necessary." At this same meeting Grabow, as president, tendered his resignation which was accepted and William C. Tobey was elected to that office and also as a director. On the same day the stockholders voted "to ratify, confirm and approve all acts of the officers and directors done in their official capacity." Title to the property on which the proposed building was to be placed was taken by The Chatham, Inc., on January 9, 1923. Ivor B. Clark, a member of the firm of William A. White and Sons, was elected syndicate manager on December 20, 1922, and on December 27, 1922, was paid $32,000 by The Chatham, Inc., for procuring a mortgage loan from the American Bond and Mortgage Company.

Clark, called by the plaintiff, testified that his firm was employed as brokers to procure a loan and that "he negotiated the underwriting of the sale of bonds in connection with The Chatham, Inc., with the American Bond and

Mortgage Company, and concluded it in August, 1922";
that from the first he had dealings with Watts and others
and understood that Watts had a contract for the erection
of the hotel and, early in October of 1922, was shown a
contract between Watts and The Chatham, Inc., which was
unsigned; that he did not remember whether Watts ex-
hibited the contract to Moore when they first met in
Chicago, but in any event there was no discussion of its terms
at that time; that he "supposed he introduced Watts to
Moore as the builder of the Chatham project." At the
time of the execution of the underwriting agreement in
Swampscott on August 30, 1922, he was acting as broker for
The Chatham, Inc., and from that time on was in almost
daily consultation with Moore. In the early part of October
he and Watts had a conversation with Moore in which Watts
said that "the Chatham could not go ahead unless the
American Bond and Mortgage Company would open the
loan and make payments *pro rata* with the Chatham on some
basis," to which Moore replied that "he would stand on his
contract, and that he would make no payments until
$1,000,000 had been spent on the building." Watts then
said that "Grabow had instructed him to say that if Mr.
Moore would not change the contract, they would have to
call the deal off," which was done. No bonds ever were
issued or sold under the agreement of August 25, 1922.
Some time in November, 1922, another agreement was
entered into between The Chatham, Inc., and the American
Bond and Mortgage Company. He further testified that
prior to the last mentioned agreement, he had tried to get
Moore to reopen the Watts contract, which he submitted to
and went over with Moore. At a still later conference,
Moore told Clark that it was impossible to reopen the Watts
contract as it was in such form it was impossible to make the
loan, and pointed out to Clark the specific matters in the
Watts contract which were in conflict with that of the Amer-
ican Bond and Mortgage Company with The Chatham,
Inc. It was "out of that meeting" that Clark was led to see
Beck and Thomas of the Longacre Company. Clark
further testified that, in talking with him about the Long-

acre Company, Moore said that "if the Longacre could satisfy him that they could build the building for a price that would permit of a loan of $2,750,000 instead of $3,200,-000, and he could be satisfied that Mr. Tobey had the secondary financing, he would reconsider it"; that Moore never requested him to do anything and he did not tell Moore that he was going to attempt to get the Watts contract cancelled. Clark reported to Moore the substance of his talks with Beck and Thomas, to the effect that they had carefully figured the plans, that they were satisfied that they could build the building for a sum of money very materially less than the Watts contract, that Moore said to Beck "Are you positive that you can build the building for this figure?" to which both Beck and Thomas said they were. He did not remember anything more that was said, but he knew that they went ahead. He also told Moore that Watts had signed an agreement to cancel his contract, but did not show or read it to him although he did tell him its terms. Clark drew up the document dated October 13, 1922, which was signed by Watts in his, Clark's, office and turned over to Tobey. Clark received no commission or benefit from the American Bond and Mortgage Company, nor was the $15,000 to be paid by The Chatham, Inc., under the underwriting agreement ever paid. He was the first person to suggest that the Longacre Company build the Chatham, and gave as his reason for doing so that they had figured and were familiar with the job, and not because Moore had expressed a willingness to reopen it if the contract could be given to that company to build. To his knowledge, Moore never made that statement or suggestion to any one.

The deposition of William C. Tobey stated that he first met Moore in the fall of 1922; that he always saw him with Clark, and at times Beck and Thomas were present. The subject matter of his interviews related to the junior financing and in connection therewith he showed Moore letters signed by Charles M. Schwab addressed to Mrs. M. B. Hayes, in which Schwab agreed to do certain financing. The plaintiff objected and saved its exception to the admission of evidence by Tobey as to what became of the

Chatham project, which was, in substance that the Chatham was never built.   Tobey testified that he never saw the Watts contract nor what purported to be one, although he acted on the supposition that one existed.   As president, he signed the contract between The Chatham, Inc., and the Longacre Engineering and Construction Company, and also signed the mortgage bonds of The Chatham, Inc., in the office of the American Bond and Mortgage Company.   He first met Clark fifteen years ago, and later, in connection with the Chatham project (in July, 1922) and thereafter frequently.   At Clark's request he saw Beck shortly after Grabow called off the deal with the American Bond and Mortgage Company.

William J. Moore testified that he was president of the American Bond and Mortgage Company, and vice-president and director of the Longacre Engineering and Construction Company in which he owned one half of the capital stock; that his two sons and his brother were officers and directors of the Longacre Company and also of the American Bond and Mortgage Company at that time; that although he was consulted at times concerning its business, he did not dominate the Longacre Company in any way; that Beck and Thomas owned seven out of a total of fifty shares of the Longacre Company, and the balance "is held by the members of my family."   The Chatham project was first presented to him by Clark, who showed him written authority contained in a letter dated July 24, 1922, addressed to Clark's firm and signed by the president of The Chatham, Inc., which set out in detail their arrangement for the sale of the first mortgage bond issue for the Chatham.   There is no conflict in the testimony of Moore and Watts as to the negotiations between them prior to November 1, 1922, except Moore denied having seen a signed contract between The Chatham, Inc., and Watts, he maintaining that his attention was called "to a draft of a contract submitted by Clark, as being a copy of contract Grabow and Watts were proposing to enter into."   This draft, dated October, 1922, was introduced in evidence and contains the following clause: "Article 8.   It is further agreed that this contract takes the place of

the contract already in existence between said parties which bears the date July 25, 1922, and which said last mentioned contract had become abrogated and null and void through the execution of this contract." Moore testified that in Chicago, Grabow asked him not to insert the name of the H. D. Watts Company as the contractor in the contract dated August 25, 1922, because he was not certain he would employ Watts as the contractor, and denied that Watts showed him the contract of July 25, 1922, either in Chicago or Swampscott. He further stated that after signing the underwriting agreement of August 25, 1922, The Chatham, Inc., utterly failed to make good as to any of its provisions, and the contract was never consummated. He also said that the American Bond and Mortgage Company approved the contract between The Chatham, Inc., and the Longacre Engineering and Construction Company, which was introduced in evidence; that the American Safe Deposit and Trust Company of Chicago, a banking institution controlled by the American Bond and Mortgage Company, became the corporate trustee, and Harold A. Moore the individual trustee for the holders of bonds under the aforementioned agreement. Harold A. Moore testified that "the bulk of the business of the Longacre Engineering and Construction Company was on buildings on which the American Bond and Mortgage Company was doing the financing."

Robert Beck, president of the Longacre Company, testified that he "first heard of the Chatham deal during the first week of October, 1922, when Mr. William J. Moore handed to him and Thomas a copy of a contract bearing the date — October, 1922 . . . between the H. D. Watts Company and The Chatham, Inc.''; that he never saw Watts; that about the middle of October Clark came to see him and said "if I would assist him in getting the American Bond and Mortgage Company to agree to sell a first mortgage bond issue on the Chatham . . . in the amount of $3,200,000 . . . then he would award the contract for the erection of the building to the Longacre Engineering and Construction Company"; that Tobey was now in position to supply the junior financing; that Charles M. Schwab was back of the deal; that

the Chatham had cancelled its contract with Watts. I then said to Clark "if you can verify all the statements that you have made to me . . . I will . . . see what can be done." Beck repeated the substance of this conversation to Moore and arranged for a meeting between him and Tobey, the result of which was that Moore said he would consider the matter.

It is not contended that Moore, while acting for himself, did not act also for the bonding company, see *Commissioner of Banks* v. *Tremont Trust Co.* 259 Mass. 162, 179; *Dempsey* v. *Chambers*, 154 Mass. 330, and it is obvious, upon the foregoing review, that the jury could find that the defendants wrongfully induced The Chatham, Inc., to break its contract with the plaintiff. There was evidence that Moore had informed Clark and Tobey of what he proposed to do and had given them authority to act for him with a view to the accomplishment of that end. *Anthony & Cowell Co.* v. *Brown*, 214 Mass. 439, 441. The question, therefore, arises, whether Moore could be held liable for inducing The Chatham, Inc., to break its contract with the Watts Company.

The defendants contend that, even if Moore knew of the Watts contract, and his object in insisting upon awarding the construction contract to the Longacre Company was to facilitate the selling of bonds by making them a better risk, yet he would not be liable for inducing it. But the jury could find, however, that Moore's object was to obtain the benefit of the Watts contract for the Longacre Company in which he was financially interested, and, if so found, Moore would be liable. *Beekman* v. *Masters*, 195 Mass. 205. *Walker* v. *Cronin*, 107 Mass. 555.

It is further contended that the "document" dated October 13, 1922, constituted a release by the plaintiff of all its rights under the construction contract. We are of opinion that the wording of the "document" discloses the intention on the part of the Watts Company to stand on its rights under the contract until the payment of a consideration for the release was secured by an instrument to which the American Bond and Mortgage Company was a party. The "document," therefore, in and of itself, does not con-

stitute a release or a cancellation of the contract. *Goldstein* v. *Ziman*, 259 Mass. 430, 432.

It appeared in the testimony of Watts that he talked about the "document" with Riddle, vice-president, and Byrnes, clerk, of The Chatham, Inc. But the plaintiff's offer of proof that Byrnes "said that he had several talks with Tobey and Clark, and if I didn't take this settlement it meant that they would lose all that they had put in, and everybody else would, that the deal would fall through. They also said they would get me $20,000 worth of preferred stock from Parker, Thomas and Rice. They said they would attempt to get a ratification of this settlement so that the agreement could be drawn cancelling the contract, and to try and put these terms through and let me hear from them. What was said about the American Bond and Mortgage Company was that they were going to get a guaranty from the American Bond and Mortgage Company for $25,000 and from William A. White and Sons a guaranty of $5,000," was rightly excluded. It does not appear that either Riddle or Byrnes had any authority to represent the corporation. *Morrison* v. *Tremont Trust Co.* 252 Mass. 383, 387, 388.

The witness Moore testified as to what happened in connection with the Chatham project after November 10, 1922, to which the plaintiff duly excepted. Although the purpose for which such testimony was offered does not appear, counsel for the parties in their briefs relating to this evidence treat it as referring to damages solely. It is settled, however, that in an action of tort for inducing a breach of contract, the damage for which recovery is had is "the loss of advantages, either of property or of personal benefit, which, but for such interference, the plaintiff would have been able to attain or enjoy." *Walker* v. *Cronin*, 107 Mass. 555, 565. *Lopes* v. *Connolly*, 210 Mass. 487, 494, 495. The plaintiff's damages accrued as of the date when the Longacre Company contract was awarded. If the plaintiff prevails, he is entitled at least to nominal damages. But he cannot recover speculative or conjectural profits or losses of any description. The measure of recovery is limited to the actual

value of the contract viewed in the light of the attendant circumstances of which the jury could find the defendants had knowledge: it is what the plaintiff would have received if he had not been deprived of its performance through the acts of the defendants; and the evidence introduced by them relating to events occurring after that date, and to some extent tending to show that, even if the contract had remained in force he could have derived no benefit therefrom, was properly admitted.

The result is, that in each case the entry must be

*Exceptions sustained.*