SIDNEY ANDERSON *vs.* K. G. MOORE, INC.

Norfolk.    October 13, 1977. — May 30, 1978.

Present: HALE, C.J., ARMSTRONG, & BROWN, JJ.

*Corporation*, Stockholder, Purchase by corporation of its stock, Offi-
cers and agents. *Sale*, Stock. *Fiduciary.*

In an action by a plaintiff seeking specific performance of the terms
of a contract, the evidence warranted findings that the contract was
not merely a sham, that the plaintiff signed the contract with the
reasonable expectation that the parties intended to carry out its
terms, and that the defendant breached a subsequent oral agree-
ment to rescind the original contract. [388–391]
In an action by a plaintiff seeking specific performance of a contract
with a New Hampshire corporation, there was no merit to the
defendant's contention that, under N.H. Rev. Stat. Ann. c. 294,
§ 101, the contract should not be enforced because enforcement
would render the defendant insolvent, where the defendant failed
to carry its burden of showing this, and where, in view of the
acquiescence of all of its directors, officers, and shareholders, the
defendant had no independent standing to invoke any rights under
§ 101, a provision intended for the benefit of creditors of the corpo-
ration. [391–393]

BILL IN EQUITY filed in the Superior Court on Septem-
ber 12, 1973.

The suit was heard by *Hallisey*, J.

*Jack R. Pirozzolo* for the defendant.

*Christopher Dye* (*Edmund M. Hurley* with him) for the
plaintiff.

ARMSTRONG, J. The plaintiff brought this action to en-
force a contract he and the defendant had executed in
August, 1972. The defendant appeals from a judgment
which ordered specific performance.

The defendant is an interstate trucking company incor-
porated under the laws of New Hampshire with a princi-

pal place of business in Nashua, New Hampshire. During
the period of time material to this dispute, the corpora-
tion had 100 shares of capital stock outstanding. The
plaintiff and his brother Walter were each the registered
owners of 20 shares. The remaining 60 shares were owned
by a third brother, Robert, although they were registered
in the name of Robert's son.[1] The directors were Walter,
the plaintiff, and Robert's son; Walter was the president
and treasurer; the plaintiff was vice president. Nothwith-
standing these designations, Robert was "the dominant
force in the management of the corporation"; it was he
who made the major decisions of corporate policy (as con-
trasted with Walter, who made the day-to-day business
decisions). The defendant was only one of several corpora-
tions through which Robert conducted his various truck-
ing enterprises.

In August, 1972, the plaintiff entered into the written
contract in question with the defendant corporation. By
its terms the plaintiff promised to transfer his 20 shares
to the corporation and to resign as officer and director
"immediately . . . upon receipt of the amount agreed to as
purchase price" for the 20 shares. The corporation prom-
ised to purchase the shares; the purchase price was
$100,000. The contract had been prepared by the corpora-
tion's attorney in accordance with instructions from Rob-
ert.

At the time of signing the contract the plaintiff was
given part payment of $25,000, a sum which had been

[1] The judge found that Robert's son held the shares as nominee for
Robert. The testimony which warranted that finding was to the effect
that Robert made the major business decisions for the corporation,
including those discussed in the opinion, notwithstanding the fact that
he was, so far as the corporate records were concerned, a stranger to
the corporation, being neither a director, an officer, an employee or
a shareholder. His son, by contrast, had no actual involvement in the
affairs of the corporation, though nominally he was the majority
shareholder and one of the three directors. During the period of the
events discussed in the opinion, he was a student at the University of
Rhode Island.

transferred by Robert to the corporation for that purpose. The plaintiff, according to his testimony, was told that the balance of the $100,000 would follow shortly. A day or two after the signing, the plaintiff sent the defendant a letter resigning his positions as vice president and director. About three months later, for reasons which were the subject of conflicting testimony, the plaintiff returned the uncashed $25,000 check to Robert, who returned it to the corporation. The plaintiff now asks for specific performance, seeking the purchase price of $100,000. It is not disputed that he is ready, willing and able to do whatever is necessary to transfer the 20 shares registered in his name to the corporation.[2]

The principal factual question which was litigated at trial concerned the intentions of the parties in executing the contract sued on. The plaintiff testified that the contract arose out of disputes between Walter and himself, as a result of which Robert decided that the best course was for the corporation to buy out the plaintiff's interest. Robert and Walter testified that it was part of a scheme by which Robert hoped to acquire an Interstate Commerce Commission interstate operating license held by a New Jersey trucking company. Such a transfer would require ICC approval, which could be delayed, perhaps for as long as three years, if the transferee were an operating company like the defendant. The alleged plan was to have the plaintiff ostensibly sever all ties with the defendant and to apply for approval of a transfer to himself. The $25,000 he received and the contract showing he was to receive $75,000 more were intended to convince the transferor and the ICC of his financial capacity. Robert and other members of the family would put up the remainder of the estimated $100,000 the license would

---

[2] During the time of the events described in the opinion it appears that the certificate was not in the plaintiff's hands but instead was in the hands of the corporation's attorney. Its present whereabouts is not clear from the record.

cost. After a period of time the trucking enterprise thus put together would be merged with the defendant corporation and the plaintiff would be restored to his 20 shares, directorship, and vice presidency of the corporation, thus augmented by the acquisition. According to Robert, the plaintiff returned the $25,000 check in November because the acquisition plan had fallen through and thus there was no point in continuing the sham. The plaintiff did not deny the existence of a plan whereby he was to acquire the New Jersey license, with Robert's help, but denied that the corporation's purchase of his 20 shares was made contingent or interdependent on the success or failure of such a plan. The plaintiff testified that he returned the $25,000 as part of an oral agreement between the brothers to rescind the contract sued on, and that the brothers failed to carry out the terms of the oral agreement in that they declined to restore the plaintiff to his positions as director, vice president and employee of the corporation.

The judge believed the plaintiff and expressly indicated his disbelief of the testimony of Robert and Walter. The defendant argues that the weight of the evidence favors the version given by Robert and Walter, and that, as the evidence is reported, this court should make its own findings. *Moss* v. *Old Colony Trust Co.*, 246 Mass. 139, 144 (1923), and cases cited. But that principle is subject to the qualification that an appellate court will not ordinarily disturb a finding made by a trial judge on conflicting oral testimony. *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 580 (1975). *Sher* v. *Malden Taxi, Inc.*, 4 Mass. App. Ct. 404, 407–408 (1976).

The judge found that the plaintiff signed the contract in the expectation, reasonable under the circumstances, that the parties intended to carry out its terms, and that finding cannot be said to be clearly erroneous. The truth may be otherwise; but a party to a sham contract necessarily runs the risk that a court may accept the contract at face value and decline to believe that it was intended

by all parties as a sham. The judge was not clearly in error in finding that the contract sued on was independent of any plan to acquire the interstate operating authority of the New Jersey company. Nor can the judge be said to have committed clear error in accepting the plaintiff's testimony about the existence of an agreement to rescind and the subsequent breach of that agreement.

Apart from a contention, discussed later, concerning the solvency of the corporation, the findings discussed above justify the judge's conclusion that the contract sued on is binding and enforceable, whether the question is viewed as matter of New Hampshire or Massachusetts law.[3] Procedural formalities were not observed; the board of directors did not meet to authorize the contract, notwithstanding a document signed by Walter stating that it had done so. But a formal meeting of the board of directors was not essential to the validity of the contract. *Tenney* v. *East Warren Lumber Co.*, 43 N.H. 343, 356 (1861). *Sherman* v. *Fitch*, 98 Mass. 59 64 (1867). *Dome Realty Co.* v. *Gould*, 285 Mass. 294, 300 (1934). *Hurley* v. *Ornsteen*, 311 Mass. 477, 480 (1942). *George H. Gilbert Mfg. Co.* v. *Goldfine*, 317 Mass. 681, 686 (1945). As we credit the judge's finding that Robert's son was merely a nominee for Robert (see note 1, *supra*), it is apparent that the contract to repurchase the plaintiff's shares was known to and acquiesced in by all the then directors, officers, and shareholders of the corporation, and it was therefore enforceable as an act of the corporation. *Kidd* v. *New York Security & Trust Co.*, 75 N.H. 154, 156 (1909). *Hennessey* v. *Nelen*, 299 Mass. 569, 572–573 (1938). *Medlinsky* v. *Premium Cut Beef Co.*, 317 Mass. 25, 32 (1944). *Winchell* v. *Plywood Corp.*, 324 Mass. 171, 175–177 (1949), and cases cited. Compare *In re National Piano Co.*, 252 F.

---

[3] The defendant contends, and we assume, that the law of New Hampshire, as the State where the corporation is chartered and has its principal place of business, is controlling, but neither the parties nor we have uncovered relevant New Hampshire case-law bearing on the resolution of certain pivotal questions.

950, 951 (D. Mass. 1918). The plaintiff's resignation as
officer and director was effective notwithstanding the ab-
sence of an acceptance at a formal meeting of the board
of directors.[4] See *Briggs* v. *Spaulding,* 141 U.S. 132, 154
(1891). 2 Fletcher, Cyclopedia of Corporations § 349
(perm. ed. 1965). In view of the judge's finding that the
rescission agreed to was contingent on restoration of the
plaintiff to the status quo ante, the failure of the condi-
tion left the plaintiff free to enforce the original contract.
Compare *H.D. Watts Co.* v. *American Bond & Mortgage
Co.,* 260 Mass. 599, 612 (1927), *S.C.* 267 Mass. 541, 551
(1929).

The only remaining question concerns a contention
that the contract should not be enforced because it would
cause the corporation to become insolvent. There can be
no doubt that an agreement to purchase a part of a corpo-
ration's capital stock would be unlawful as a fraud upon
creditors if the effect of the agreement would be to leave
the corporation with insufficient property for the pay-
ment of all its debts. N.H. Rev. Stat. Ann. c. 294, § 101
(1966 ed.). *Donahue* v. *Rodd Electrotype Co. of New Eng-
land, Inc.,* 367 Mass. at 598. But it has not been estab-
lished that that is the case here. Even if we were to con-
clude that the evidence did not warrant the judge's find-
ing that the corporation would not be rendered insolvent

---

[4] The defendant argues that the plaintiff's resignation as officer and
director never became effective because his contractual duty to resign
did not arise until the $100,000 purchase price was paid to him, and
that never occurred. The argument seems to be predicated on an
assumption that the contract in issue is unilateral in nature, imposing
on the plaintiff the duty to resign and turn in his stock if and when
the defendant should tender payment of the purchase price. But the
contract is unambiguously bilateral, imposing on the corporation an
obligation to complete the purchase. Whether the plaintiff was re-
quired to submit his resignation prior to receiving the $100,000 is thus
irrelevant; the critical facts are that he did resign and is ready, will-
ing, and able to do all acts necessary to transfer his shares to the
corporation—his only remaining obligation under the contract.

by payment of the $100,000,[5] the corporation could not prevail in this appeal; for, in our opinion, it was the corporation, as the party raising the issue of insolvency as a defense to a contract it had otherwise validly entered into, which had the burden of proof on the issue. See *Crimmins* v. *Kidder Peabody Acceptance Corp.*, 282 Mass. 367, 377 (1933); contrast *Hurley* v. *Boston R.R. Holding Co.*, 315 Mass. 591, 618 (1944). Thus, it is the absence of a finding that the corporation will be rendered insolvent if it is made to honor its contract, rather than the judge's finding to the contrary, which is fatal to the defense raised.

There is a further reason the defense must fail. Section 101 of the New Hampshire statute is clearly intended for the benefit of creditors of the corporation. The defendant is not part of the class primarily intended to benefit from the protection of the statute. It has no standing to invoke the rights of a creditor for the purpose of avoiding its own contractual undertakings. 7 Cavitch, Business Organizations § 147.04[3] (1977). "Where, as here, all the stockholders and officers, with full knowledge of the facts,

[5] The finding may have been based on a presumption of regularity arising from the act of the directors in authorizing the contract, or it may have been based on ample testimony that the corporation was able to draw freely on the resources of the controlling shareholders' and directors' family to raise such sums as the $25,000 paid to the plaintiff at the time of signing the contract and the estimated $175,000 which was to have been needed to purchase the interstate operating rights of the New Jersey company. If the evidence did not warrant the judge's finding, it does not, of course, follow that the judge was required to make a contrary finding. He could refuse to believe the unaudited corporate balance sheet (compare *Mountain State Steel Foundries, Inc.* v. *Commissioner*, 284 F.2d 737, 741–742 [1960]), which was prepared by an employee of the corporation and purported to show that the total shareholders' equity in the corporation was less than $100,000; moreover, the balance sheet purported to show the financial state of the corporation as of March 31, 1975, three months before trial, rather than in August, 1972, when the contract was executed. Compare *Barrett* v. *W.A. Webster Lumber Co.*, 275 Mass. 302, 308 (1931); *Scriggins* v. *Thomas Dalby Co.*, 290 Mass. 414, 416–417, 420–421 (1935). Contrast Ballantine, Corporations § 256a, at 608 (1946 ed.).

assented to the transaction, the corporation cannot complain that it was fraudulent." *Hennessey* v. *Nelen,* 299 Mass. at 572–573, quoting from *Dome Realty Co.* v. *Gould,* 285 Mass. at 299. See also *Columbian Insecticide Co.* v. *Driscoll,* 271 Mass. 74, 78 (1930); *Medlinsky* v. *Premium Cut Beef Co.,* 317 Mass. at 32. We do not question the principle that "the directors of a corporation act in a trust capacity in so far as . . . creditors are concerned," *Mica Prod. Co.* v. *Heath,* 81 N.H. 470, 471 (1925), *Peterson* v. *John J. Reilly, Inc.* 105 N.H. 340, 346 (1964); but we think that where all the officers, directors and shareholders of a corporation have acquiesced in an act of the corporation, the corporation itself has no independent standing to complain. Should there be, in fact, a creditor against whom the contract sued on is fraudulent, he will have a remedy in the personal liability of the directors and the plaintiff to the amount of the assets improperly diverted from the corporate defendant. See N.H. Rev. Stat. Ann. c. 294, §§ 102, 104 (1966 ed.); G. L. c. 156, § 37; *Calkins* v. *Wire Hardware Co.,* 267 Mass. 52, 59–60 (1929); *Moseley* v. *Briggs Realty Co.,* 320 Mass. 278, 281 (1946). See also *Richardson* v. *Devine,* 193 Mass. 336 (1907).

The defendant raises a further contention, that the transaction is in violation of N.H. Rev. Stat. Ann. c. 294, § 28 (1966 ed.), which prohibits a corporation from purchasing its own capital stock except out of earned surplus or, in some circumstances, capital surplus. This contention was not raised in the Superior Court except in support of the defendant's motions for a new trial. At that stage it presented at best a matter for the judge's discretion. *Syriopoulos* v. *Cormier,* 297 Mass. 226 (1937). *Eva-Lee, Inc.* v. *Thomson Gen. Corp.,* 5 Mass. App. Ct. 823, 823–824 (1977). In any event, the contention stands on the same analytical footing, and suffers from the same deficiencies of standing and burden of proof, as the related contention concerning insolvency; if § 28 is meant to provide protection not only for creditors but for other stockholders, the affected stockholders in this case were them-

selves the architects of the contract the corporation now seeks to avoid by invoking their rights. It is basic that the corporation cannot stand in a better position than the assenting shareholders when it invokes their rights.

> *Judgment affirmed.*
> *Orders denying motions for a new trial*
> *and for relief from judgment affirmed.*