## FORDIE H. PITTS, JR. vs. HALIFAX COUNTRY CLUB, INC. & another.[1]

Suffolk.   March 22, 1983, August 31, 1984. — March 26, 1985.

Present: ARMSTRONG, ROSE, & DREBEN, JJ.

*Corporation*, Merger, Stockholder. *Frauds, Statute of. Equitable Remedy. Estoppel.*

A shareholder of a corporation was estopped from asserting that he was entitled to rescission of a merger of the corporation and two other corporations on the ground that the merger had been approved in violation of G. L. c. 156B, § 78 (*c*), where, prior to the merger, the shareholder had orally agreed with the corporation's president to a buy-back of his shares, on terms which gave him a substantial profit, knowing that the purpose of the buy-back was to enable the corporation to consummate the merger, where the corporation's president had relied on that agreement to his detriment, thinking in good faith that he was the only individual who then had a financial interest in the merger, and where to allow rescission of the merger would grant the shareholder an undeserved windfall and work an injustice to the shareholders of the non-surviving corporations. [530-536]

BILL IN EQUITY filed in the Superior Court on May 5, 1971.

The suit was heard on a master's report by *Joseph A. Furnari,* J., sitting under statutory authority.

*Richard J. Innis* for the plaintiff.

*Alton F. Lyon* for Halifax Country Club, Inc.

ARMSTRONG, J. This action was commenced in 1971 by a shareholder of the defendant corporation (Halifax) for the purpose of unraveling a 1969 merger of Halifax and two other corporations or to exercise appraisal rights for the plaintiff's shares of stock in Halifax. The case followed a laborious and procedurally anomalous course in the Superior Court. It comes

---

[1] The Secretary of the Commonwealth.

before us on a master's report, a report of evidence, and independent findings made by a judge from the reported evidence.[2] Although the master's report was never in so many words adopted by the judge, he did expressly (and properly) overrule the objections to the subsidiary findings (subject to a single modification not now material). Those findings were amply supported by the evidence. The judge disagreed with the master's "general findings," which were four in number. Three were in essence rulings of law based on the facts found. One was an inference of fact drawn from the subsidiary findings. Under the circumstances we treat the judge's action in overruling the plaintiff's objections to the subsidiary findings as an allowance of Halifax's motion to adopt the master's report with the general findings excised. Compare *Snyder* v. *Sperry*

[2] The first significant progress in the case occurred in 1977, when the plaintiff filed and the court allowed a motion for summary judgment as to liability. A year later the case was referred to a master to make findings relative to the remedy. An amended complaint was allowed in January, 1979, and the master's report was filed in September of that year. The plaintiff filed numerous objections, seeking a summary of the evidence supporting most of the significant subsidiary findings. As the judge had earlier allowed a motion by the plaintiff to require the master to report the evidence, the master regarded the summaries as pointless and had initially declined to prepare them. (So far as the record shows he had not been furnished with draft summaries as suggested in *Miller* v. *Winshall*, 9 Mass. App. Ct. 312, 315-316 [1980]; and the affidavit required by the Superior Court rules, *see id.* at 316-317, and *Thomas O'Connor & Co.* v. *Medford*, 16 Mass. App. Ct. 10, 15 [1983], had also not been filed.) The court ordered him to furnish summaries nonetheless, and these were furnished in June, 1980. The form of the summaries (reference to the lines in the transcript where the supporting evidence was to be found) was ruled objectionable: The master was ordered to set out or paraphrase the supporting evidence. Summaries revised to comply with the order were filed May 1, 1981. A judge then took the case under advisement and, taking a different view of the case from that of the master, entered a judgment (in March, 1982) supported by his own findings from the reported evidence. The plaintiff's appeal, entered in this court in June, 1982, was argued in March, 1983, but was rebriefed in August and September, 1984, on motion of Halifax.

The master was subjected to some criticism in the record, largely undeserved in our view. His report is a succinct and workmanlike job. The findings that were objected to for want of an evidentiary basis appear amply supported by the evidence summarized and even more fully supported when reference is made to the voluminous transcript.

*& Hutchinson Co.,* 368 Mass. 433, 435 n.1 (1975). On the view we take of the case, the master's subsidiary findings, with inferences properly drawn therefrom, furnish an adequate basis for the entry of judgment.[3] Contrast *Lattuca* v. *Consolito,* 343 Mass. 747, 752-753 (1962); *Glynn* v. *Gloucester,* 9 Mass. App. Ct. 454, 457-459 (1980). Viewing the case as one coming before us on an adopted master's report, presenting the question what judgment should be entered on the stated findings, we stand in the same position as the judge below and thus accord no particular deference to the judge's independent findings and rulings.[4] Compare *Peters* v. *Wallach,* 366 Mass. 622, 626 (1975); *Bills* v. *Nunno,* 4 Mass. App. Ct. 279, 283-284 (1976); *Vincent* v. *Torrey,* 11 Mass. App. Ct. 463, 466 (1981); *Hardiman* v. *Hardiman,* 11 Mass. App. Ct. 626, 628 (1981).

In 1965 one Henrich undertook with a colleague, Wyman, to form a golf club in the town of Halifax; they formed the defendant corporation (Halifax) and they each contributed land (and, in Henrich's case, a house) to be used for the course and clubhouse. Their contributions were worth in the vicinity of $50,000 each. Halifax had an authorized stock issue of 300 shares. Henrich and Wyman were each issued forty-nine. One Sullivan, who may have furnished legal services to Halifax

---

[3] The parties (other than the Secretary of the Commonwealth, who is a nominal party and has not appeared in this court) both take the position that the case is ripe for a final judgment and, in view of the protracted proceedings to date, seek to avoid a remand for further proceedings.

[4] We mention all this simply to clarify our procedural approach to the case. The findings made by the judge are not in conflict with the master's in respects material to decision, but, because they appear to have been constructed with reference to a different view of the controlling principles of law, are less usefully organized for purpose of decision. There is no need for us to pass on the propriety of the judge's making independent findings, subsidiary in nature, from the transcript of testimony. See and contrast *Henderson* v. *D'Annolfo,* 15 Mass. App. Ct. 413, 425-427 & n.18 (1983). On general principle, however, an appellate court would not deem itself bound by such findings, because it is in as good a position as the trial court to read and draw inferences from a written transcript. Moreover, nothing hinges on our characterization that the judge implicitly adopted the master's report, because we would otherwise hold that Halifax's motion to adopt the master's report (the plaintiff's objections thereto being without merit) should have been allowed.

and who was named clerk, was issued two. After some development of the property, Halifax opened as a nine-hole course in 1967. In October of that year the authorized capital stock was increased to 5,300 shares. In December Halifax bought back Wyman's shares for $60,000. At some time Sullivan transferred one of his shares to Halifax and one to Henrich.

From the outset Henrich was the moving force behind Halifax and ran it as his own company. He wished to enlarge the course to eighteen holes. He advertised for investors and, between January and September, 1968, he attempted to raise money for Halifax by issuing and selling shares at $100 per share. Each investor was promised by Henrich that he could return his shares at any time and would receive back his $100 plus six percent interest.

In March, 1968, the plaintiff, Pitts, who apparently had extensive experience both in playing golf as a professional and in operating golf courses, responded to an advertisement and indicated to Henrich that he wished to acquire a position in Halifax but primarily for services rather than cash. On March 30 of that year Henrich (as president of Halifax) and Pitts executed a written agreement by which Pitts was engaged to serve as director of operations of the golf club and course and consultant to the management for a period of one year, on a part-time basis (twenty hours per week, at times of his own choosing), for which he was to receive 100 shares of Halifax stock. He was also given a three-year option (beginning October 1, 1968) to purchase up to 750 shares at a price of $100 per share, and Henrich (for Halifax) promised that Halifax would hold enough shares unissued until the end of the option period to be able to make good on the option.[5] In May, 1968, Pitts purchased twenty shares for $2,000, whether against the option or independently does not appear. In November, the same year, he was issued the promised 100 shares for his services in the golfing season. Pitts thus held 120 shares. Henrich continued

---

[5] The agreement also gave Pitts a right of first refusal for three years to match any offer Halifax might receive for purchase or lease of substantially all its assets.

to run Halifax as if he were the dominant stockholder, although, having done nothing to adjust his own shareholding, at the time he effected the tenfold (plus) increase in the authorized capital stock and started to sell off shares at $100 apiece, he (Henrich) held only fifty shares.

The corporate records, including the stock register, were kept with some informality, and it is difficult to reconstruct accurately exactly how many shares may have been outstanding in 1968. At the time Pitts and Halifax entered into their agreement, it was represented (in the agreement) that, of the authorized shares (stated inaccurately to be 5,000), 185 shares were issued and outstanding and 50 additional shares were held in Halifax's treasury. Halifax had been losing money in its first two years of operation. By the winter of 1969, Henrich apparently decided that a preferable way to raise capital for the Halifax operation was by merger with two other corporations he owned (apparently as sole shareholder), which had financial assets and cash flow that Halifax lacked and could themselves derive some benefit in their tax obligations from Halifax's losses. Henrich thus determined to buy back the outstanding Halifax stock (except his own) and to effect the merger. All of the shareholders agreed, selling back their shares to Halifax for $100 apiece plus six percent interest, except for Pitts and one other shareholder, who held but a single share and is not involved in this litigation.[6]

In February, 1969, Henrich negotiated for the return of Pitts's shares, explaining the merger plans to Pitts. Pitts declined an offer of $100 per share with six percent interest, but the parties eventually agreed on terms whereby Pitts would sell his shares back to the corporation, receive $18,000 in cash, enter into a noncompetition agreement and a long-term membership and consulting arrangement, retain a right of first refusal should an offer be made for the club and grounds, and surrender his

---

[6] One of the shareholders, O'Malley Corporation, may have sold its fifteen shares to Henrich rather than to Halifax. If so, Henrich would have held 65 shares, rather than 50, on the day of the merger. Because the master used the latter figure in his findings, and the correctness of his doing so is not challenged here by either party, we treat 50 as the correct figure.

option to purchase an additional 750 (perhaps now 730) shares as spelled out in the March, 1968, agreement. One point remained to be settled: the form in which Pitts would receive the $18,000: whether the entire sum would be attributed to his 120 shares (i.e., at $150 per share) or a part, probably $6,000, attributed to the noncompetition agreement. Pitts was to decide, and the attorneys for Pitts and Halifax were to work out the text of the agreement.

Armed with the oral understanding and relying on the assumption that it would achieve fruition, Henrich called a stockholders' meeting for February 28, 1969, which approved the merger with his other two corporations. The meeting was attended by Henrich and one Lajoie, then clerk of Halifax. Pitts was given no notice of the meeting and, of course, did not attend. Halifax was the surviving corporation, into which the others were merged. The merger agreement provided for an authorized stock of 8,000 shares. The nonsurviving corporations brought assets into Halifax valued in the aggregate at $534,500, and Henrich, as the sole shareholder of each, was issued 5,345 additional shares of Halifax. The articles of merger were duly filed with the Secretary of the Commonwealth.

On March 11, 1969, the attorney for Halifax sent to Pitts's attorney a draft incorporating Henrich's version of the terms of the agreement. Pitts did not execute the drafts; instead, his attorney forwarded two agreements to Halifax, one incorporating the terms of the sale and the other varying the terms of the noncompetition agreement. Henrich talked to Pitts by telephone, agreed to the sale agreement and returned the noncompetition agreement to Pitts with a proposed compromise and a suggestion for a new provision limiting Pitts's eligibility for the annual club championship tournament to years in which Pitts maintained a certain level of activity in the club. By 1970 the letters had ceased to be congenial, and it was apparent that the oral agreement had collapsed. Pitts commenced his action in May, 1971.

Pitts's position is essentially as follows. Halifax's failure to give Pitts notice of the shareholders' meeting at which the merger was approved was a violation of G. L. c. 156B, § 78(c),

as amended by St. 1965, c. 685, § 32 (see now § 78[*c*][1][ii]). For that reason, as well as for the reason that the merger failed to secure the approval of two-thirds of the Halifax shares then outstanding (*id.*, see now § 78[*c*][1][iii]), the merger was void. Pitts is therefore entitled to have the assets of the three merged corporations segregated and to receive for his stock a sum representing a percentage of Halifax's golf course and club assets equal to the percentage of Halifax stock he owned going into the merger. Specifically, he contends that Halifax's net worth today, segregated out from the other two corporations, is $1,013,754.28; and that he is entitled to 70.18 percent (i.e., 120 shares out of 171 outstanding shares on the date of merger) of that sum, or $711,453. In addition, he seeks compensation for the 750-share stock option, said to have been made unexercisable by the merger, measured by the difference in value between his asserted portion of Halifax's net worth, computed as stated above, and the larger portion of Halifax which would have been his if he had exercised the option before the merger (94.46 percent); then subtracting from that difference the $100 per share cost of exercising the option. This amounts to an additional $241,984.

Pitts's position has the virtue of simplicity; but that simplicity is made possible by failing to take into account the facts that most troubled the master and the judge: namely, the facts that Pitts had agreed with Henrich to sell his shares back to Halifax for $18,000 before the merger took place, and that Henrich relied on that agreement, thinking in good faith that he was the only individual[7] who then had a financial interest in the merger. Pitts's position throughout the trial before the master (where Pitts denied that the parties had reached an agreement — a fact now settled against him) and, later, in court is that any such oral agreement should be disregarded altogether because, under G. L. c. 106, § 8-319, as then in effect,[8] a contract

---

[7] Except the individual who owned a single share, about whose situation we are left uninformed by the present record.

[8] The version then in effect is set out in St. 1957, c. 765, § 1. The section has since been revised by St. 1983, c. 522, § 5, in a respect not here material.

for the sale of securities is not enforceable by way of action or defense unless in a writing signed by the party to be charged (subject to exceptions not here material). The agreement on which Halifax relies, although reduced to writing by its attorney, was never executed by the parties.

Section 8-319, like all Statutes of Frauds, serves a salutary purpose and is not to be evaded by subtle verbal distinctions, however desirable such evasion might be to do justice in the particular case. See *Colt* v. *Fradkin,* 361 Mass. 447, 451-453 (1972). By its terms the statute makes this oral agreement unenforceable. Pitts's position that the agreement is not legally binding on him, and that Halifax may not enforce it against Pitts is unquestionably correct.[9] This is as true in equity as at law. *Glass* v. *Hulbert,* 102 Mass. 24, 28, 43 (1869).

He is not on sound ground, however, on another point. The failure to comply with the requirements of what is now G. L. c. 156B, § 78(*c*)(1)(ii) and (iii), does not void the merger per se, but instead makes it voidable at the insistence of a shareholder who for any reason objects to the merger and is not by his actions estopped from voicing his objection thereto. The purpose of such statutory provisions is to protect the rights of shareholders. A failure to adhere to their mandate will not normally be ground for invalidation at the instance of others. See *Mills* v. *Electric Auto-Lite Co.,* 396 U.S. 375, 386-389 (1970), and cases and authorities cited at 387; *George H. Gilbert Mfg. Co.* v. *Goldfine,* 317 Mass. 681, 685-687 (1945). Statutory requirements intended to protect shareholders may be waived by shareholders. *Royal Indemnity Co.* v. *American Bond & Mortgage Co.,* 289 U.S. 165, 171 (1933). *Greene* v. *Reconstruction Fin. Corp.,* 100 F.2d 34, 35-36 (1st Cir. 1938). *Mid-Continent Tel. Corp.* v. *Home Tel. Co.,* 319 F. Supp. 1176, 1195 (N.D. Miss. 1970). Annot., 58 A.L.R. 2d 784, § 3 (1958). Where rights of creditors or other outsiders are not involved, actions taken without compliance with corpo-

---

[9] The converse is not true. By memoranda sufficient to satisfy the requirements of § 8-319(*a*), Halifax has, in the course of this litigation, acknowledged the agreement. It could not now plead the statute in bar of the agreement. See § 8-319(*d*).

rate formalities have frequently been held to bind shareholders. See *Samia* v. *Central Oil Co.,* 339 Mass. 101, 109-110 (1959); *Trager* v. *Schwartz,* 345 Mass. 653, 658-659 (1963); *Anderson* v. *K.G. Moore, Inc.,* 6 Mass. App. Ct. 386, 390-391 (1978), cert. denied, 439 U.S. 1116 (1979).

Pitts received no notice of the shareholders' meeting of February 28, 1969, where the merger was voted on; but, on the master's findings, he cannot claim not to have had notice of the merger. Henrich discussed the proposed merger with Pitts on five or more occasions, explaining that he needed Pitts's shares to effect the merger. Pitts agreed to sell his shares back to Halifax, knowing that the purpose of the buy-back was to enable Halifax to consummate the merger. The testimony of Henrich on this point, credited by the master, fully warranted a finding that the agreement was complete in all its essential terms, that the sole point to be resolved was the form in which Pitts would choose to receive the $18,000, that this point was of no concern to Henrich or Halifax, and that the function of the attorneys was only to set the agreed upon terms in written form for execution by the parties. Because the writing was never executed by Pitts, the agreement cannot be enforced against him; but the relevant question here is whether Pitts, having agreed to sign off on the shares knowing the purpose of the buy-back was to effect the merger, may now object that he was not given notice of the meeting and an opportunity to vote against the merger. Or is he estopped by his agreement (together with his knowledge of Henrich's purpose in seeking the agreement) from now seeking rescission of the completed merger?

The context is all important. This is an equitable proceeding, and it is Pitts who seeks to invoke the equitable powers of the court. It is commonplace that one who seeks equity must do equity, *New England Merchants Natl. Bank* v. *Kahn,* 363 Mass. 425, 428 (1973), and that a court will not permit its equitable powers to be employed to accomplish an injustice. *Brown* v. *Leighton,* 385 Mass. 757, 760 (1982). The court must therefore consider whether the merger worked an injustice to Pitts which calls for a remedy, and whether the remedy he

seeks from the court would work an injustice to other interested persons.

The answer to both questions lies in an understanding of the financial relationships affected by the merger, which appear, not with precision, but in rough outline, from the master's findings, augmented by the accounts and other documents that, on motion of Pitts, became a part of the record in this case. It is a fair inference from the master's findings that, for his 120 shares, Pitts paid the equivalent of $12,000, partly in cash (for twenty shares), and partly in services (for 100 shares). (Shares were being offered and sold to investors for $100 per share when the agreement for Pitts's services was executed, justifying an inference that the parties settled on the value of his services as $10,000.) Under the oral agreement for repurchase by Halifax, made less than a year thereafter, Pitts was to receive $18,000. If this sum were attributed solely to the 120 shares, an inference would be warranted that shares were then thought by the parties to be worth $150 apiece. Such an inference is unduly speculative, however, in view of the facts that the repurchase agreement involved Pitts's giving up his option to purchase additional shares at $100 apiece, his agreement not to compete, and the fact that Pitts, whose cooperation was essential if Henrich was to effectuate his reorganization plan, had bargaining power beyond the value of his shares. When Henrich's other corporations were merged into Halifax, they were issued shares for their assets on the basis of one for each hundred dollars of their net worth. No showing has been made that a merger on those terms impaired the value of Halifax's then outstanding shares; and an inference could be drawn that the merger was a prudent business decision for Halifax, and thus for all its shareholders, in that it generated the equity capital needed for development. Looking at the Halifax shareholders individually, we note that it was only Henrich who might have had reason to complain, he having paid (in property) approximately $1,000 per share for his fifty shares in Halifax. Pitts, by contrast, had obtained his shares,

within the year, on the same $100 per share basis as the two merged corporations.[10]

Pitts now seeks to have the golf course and club assets segregated from the real estate business assets and to be awarded 70.18 percent (or 94.46 percent, if the stock option is included) of the present golf course and club assets. The figures he assigns to these percentages ($711,453 and $953,437, respectively) derive from an accountant's ledger purporting to segregate as of the time of trial (in 1978) the assets and liabilities attributed to Halifax's golf course and club operations from those attributable to its real estate operations (the two nonsurviving corporations were in the business of real estate sales and development). The principal purpose of the merger, however, was to employ the substantial financial assets of the nonsurviving corporations to expand Halifax's golf course and club facilities. In return the shareholders of these corporations (that is, Henrich) received shares of Halifax. What Pitts now proposes, in essence, is to siphon off the greater part (it we use 70.18 percent) or substantially all (if we use 94.46 percent) of the net worth of Halifax's segregated club operations, and to leave the shareholders of the nonsurviving corporations, who contributed the lion's share of the assets, with an empty bag.

It is a clever but iniquitous claim, one not justified by any substantial wrong done to Pitts. On the master's findings, Pitts was dealt with openly and fairly by Henrich. He agreed to be

---

[10] Halifax still had the real estate originally contributed by Henrich and Wyman, which had presumably not declined in value, but it had added land and spent considerable sums on development and suffered net losses in income in its early years. It had thus become encumbered with debt, and there is evidence that, at the time of the merger, it had a net worth substantially less than the original contributions by Henrich and Wyman. This appears, not in the master's report, but from a Halifax balance sheet prepared by an accountant just prior to the merger. There was evidence to the contrary on this point. In resolving the conflict we would be inclined to give weight to the arm's-length agreement between Pitts and Halifax as a true approximation of Halifax's then net worth.

bought out, on terms which gave him a substantial profit,[11] and he knew or had reason to know that Halifax and Henrich would rely on that agreement. The elements of estoppel are made out. See *Cellucci* v. *Sun Oil Co.*, 2 Mass. App. Ct. 722, 728 (1974), *S.C.*, 368 Mass. 811 (1975). In *Cellucci*, estoppel was used as a sword, to prevent the defendant from raising an otherwise valid defense to the plaintiff's claim. Here estoppel is only used as a shield, to prevent the plaintiff, in pursuit of an undeserved windfall, from denying the existence of an agreement upon which the defendant justifiably relied in effecting the merger. To apply estoppel here does no violence to the Statute of Frauds, expressed in G. L. c. 106, § 8-319. The defendant does not seek to enforce the agreement, and the court will not order it enforced. The statute is given full scope and effect. The effect of the estoppel here is only to prevent the plaintiff from objecting to a merger which did not impair his shares, and to leave him a shareholder, to the extent of his 120 shares,[12] in the merged Halifax.

---

[11] The agreement was analogous to an exercise of appraisal rights under G. L. c. 156B, §§ 85-98, by a minority shareholder who objects to a merger. See *Piemonte* v. *New Boston Garden Corp.*, 377 Mass. 719, 723-724 (1979). Here, of course, Pitts was the majority shareholder and could have blocked the merger if he had not elected to be bought out. The master warrantably took the price negotiated by the parties as good evidence of the value of Pitts's shares and option at the time of the merger.

There is a suggestion in the record, but no finding by the master, that Pitts may have thought he was only a minority shareholder. Indeed, the judge made a finding that there was, at the time of the March, 1968, agreement (under which Pitts acquired his shares), a mutual mistake of fact, the parties thinking that Pitts was purchasing only an insignificant minority interest in Halifax, rather than a substantial interest. As Pitts argues, such a finding lacks support in the evidence, where the March, 1968, agreement itself stated there were then only 185 shares of Halifax issued and outstanding. Henrich testified that he told Pitts (in February, 1969) that he needed Pitts's shares to effect the merger; and there is no suggestion that Henrich ever misled Pitts as to the sizes of their respective shareholdings.

[12] Pitts may not now exercise the option to purchase additional shares, because the option expired in 1971. It has been held consistently that one seeking to exercise an option must meet all the option conditions. *Westinghouse Bdcst. Co.* v. *New England Patriots Football Club, Inc.*, 10 Mass. App. Ct. 70, 73-74 (1980). This requires at least a tender of the option price before the time in which to exercise the option expires. *Hunt* v.

Halifax, as noted earlier (see note 10, *supra*), has acknowledged and relied on the fact of the oral agreement in opposing rescission of the merger. In fairness to Pitts, Halifax must now be prepared to honor the agreement if Pitts so desires. Therefore, if, within thirty days of rescript, Pitts files in the trial court a motion seeking enforcement of the agreement, a judgment, conditional on tender of his shares, shall be entered for Pitts in the amount of $18,000, without interest.[13] Otherwise a judgment is to be entered dismissing the action. There are to be no costs of appeal to either party.

*So ordered.*

---

*Bassett,* 269 Mass. 298, 301-302 (1929). Here there was no tender of the option price, in court or otherwise.

[13] Pitts is not entitled to interest as damages for delay, because he could have obtained payment of the $18,000 at any time by tendering his shares to Halifax. Compare *Peters* v. *Wallach,* 366 Mass. 622, 629 (1975).