**A.A. MARTIN TRANSPORTATION CO., INC.**

v.

**Anthony ALMONTE et al.**

**80–568–Appeal.**

Supreme Court of Rhode Island.

Nov. 15, 1983.

Edmond A. DiSandro, Guy Bissonnette, DiSandro-Smith & Assoc. P.C., Providence, for plaintiff.

Stephen C. Mackie, Thomas L. McDonald, Almonte, Lisa & Pisano, Providence, for defendants.

## OPINION

KELLEHER, Justice.

The plaintiff, A.A. Martin Transportation Co., Inc. (Martin), is a Massachusetts corporation that specializes in the interstate hauling and rigging of heavy machinery throughout the New England area. Martin is before us on an appeal even though judgment was entered in its favor in the Superi-

or Court in a jury-waived trial against Anthony Almonte (Almonte) for $6,784.47.

This litigation is a culmination of events that began in mid-July 1977, when Martin's president received a telephone call from Almonte, who asked Martin's chief executive if he would be interested in moving machinery from an ice-cream-producing plant in North Abington, Massachusetts, to various locations in Providence, with the bulk of the equipment slated for installation in a building at 83 Greenwich Street, which formerly housed the Federal Ice Cream Co. After traveling to the North Abington site and examining the potential cargo, Martin's president came to Providence and surveyed the Greenwich Street premises. Upon his return to Martin's headquarters in Boston, the president called Almonte and informed him that the estimated cost of the project was approximately $4,000. On July 22 Almonte awarded the contract to Martin and told it that the moving costs would be paid by Fairway Foods, Inc. (Fairway). Martin's president testified that he was of the belief that a contract of carriage had been entered into by the hauler with Almonte and Fairway.

The interstate move began on Tuesday, July 26, and ended on August 3. The cargo's pièce de résistance was a mammoth piece of equipment called a Gramm Machine. This machine, which weighs fifteen tons and measures ten feet in diameter, produces a variety of ice cream goodies, including Popsicles, Fudgsicles, and eskimo pies.

On the last day of the job, August 3, Martin's president stopped by to see Almonte at 83 Greenwich Street. When he asked Almonte to sign a delivery receipt and to furnish the carrier with a specific list of the transported property, Almonte responded in the negative. The following day the president furnished Almonte with an itemized bill for $5,510.93, representing the cost of services rendered in the moving and rigging of the machinery. Almonte then informed Martin of the possibility of a claim's being filed against the carrier for

damage to cargo and of the necessity of his seeking legal advice.

From that point on, Martin became embroiled in litigation. On September 12, 1977, Fairway instituted suit in the United States District Court for the District of Massachusetts against Martin and sought $2 million for damage allegedly sustained by Martin's negligent handling of the Gramm Machine.[1] Later, on September 28, 1977, Martin instituted suit against Almonte, his cousin Dennis, Rosella Lombari d.b.a. Federal Dairy Co., Inc. (Rosella), and Fairway. Subsequently, on November 4, 1977, Martin was permitted to file an amended complaint and add as defendants Almonte's wife, Grace; his father, Angelo; and his brother, William; as well as three corporations, namely, Chepam, Inc. (Chepam), Consolidated Ice Cream, Inc. (Consolidated), and Santina Realty, Inc. (Santina). The allowance of the submission of an amended complaint and the addition of six additional defendants expanded Martin's simple collection claim to a point where the Superior Court file now consists of two bulky volumes of documents, most of which relate to claims, counterclaims, a request for prejudgment attachment of real estate, discovery requests, responses to such requests, and motions to compel responses.

The hearing on Martin's motion to attach real estate began in late October 1978 and was conducted on three subsequent occasions, with the last taking place on March 8, 1978. Almonte, his wife, and his cousin Dennis testified as adverse witnesses. Almonte's cousin had no contact whatsoever with Martin. He was totally unaware of who actually owned the premises at 83 Greenwich Street. He also insisted that neither he nor Rosella owned or operated Fairway. Almonte told the motion justice that his wife now owned the equipment that Martin had transported to the Greenwich Street address. According to Almonte, his wife purchased the equipment from his father.

It also became clear at this hearing that in the summer of 1977 when Martin agreed to move the equipment, Fairway had not been incorporated. It was revealed that Fairway's incorporation took place in the state of Delaware on September 29, 1977.

Grace Almonte informed the motion justice that she was a registered nurse. As the hearing progressed, it was subsequently disclosed that she was agent for service of process for both Consolidated and Chepam. Grace said that she purchased the equipment and the real estate at 83 Greenwich Street for about $75,000. The equipment was purchased from her father-in-law, Angelo, and the real estate came by way of a deed from Santina. She also said that she had leased the equipment to Fairway. She had no idea of Chepam's corporate purpose, but evidence pointed to the fact that a car operated by her husband was registered to that corporation.

Prior to permitting the attachment of certain real estate standing in the wife's name, the motion justice observed that he was witnessing a deliberate attempt to make it as difficult as possible for Martin to find any attachable property that might serve as security for a judgment that might be rendered in its behalf.

When the controversy came on before the trial justice in June 1980, Martin's president conceded in cross-examination that he had never had any contact whatever with Consolidated, Chepam, Santina, Almonte's wife, his father, or his brother. He conceded that the only parties whom he considered to be indebted to Martin were Almonte and Fairway.

After Martin had rested, the trial justice acted pursuant to the provisions of Rule 41(b)(2) of the Superior Court Rules of Civil Procedure and denied Martin's claim as it related to the six defendants who had been added to the controversy when Martin's motion to amend the original complaint was granted. Thereafter, he dismissed Al-

1. The suit was dismissed two years later, in November 1979, for Fairway's failure to comply with the discovery provisions of the Federal Rules of Civil Procedure.

monte's and Fairway's counterclaims, in which they claimed that Martin's negligence had damaged various portions of the cargo. The dismissal was based on the trial justice's observation that Almonte was not worthy of belief.

The counterclaims of the six additional defendants, in which they sought damages for malicious prosecution, were dismissed by the trial justice for several reasons, including this court's holding in *Jacques v. McLaughlin,* 121 R.I. 525, 401 A.2d 430 (1979), where it was emphasized that success in pursuing a claim for malicious prosecution depends upon a showing of special injury beyond the consequences usually associated with defending oneself against an unfounded legal charge. Here, the cross-claimants showed no special injury.

In considering Martin's original complaint, the trial justice was satisfied that all its charges were fair and reasonable and that they should be paid by Almonte. He also observed that since Fairway was not a viable corporation in the summer of 1977, there could be no recovery against it because there was no evidence that Fairway, once organized, ever ratified Almonte's actions. The necessity for a ratification finds ample support in *Katz v. Prete,* R.I., 459 A.2d 81, 86 (1983), where we stressed that a preincorporation contract can be ratified by a corporation once the entity has been properly organized.

In the first facet of its appeal, Martin faults the trial justice for having violated the principle known as "the law of the case." We have pointed out on many occasions that the law-of-the-case doctrine provides, generally speaking, that after one justice has decided an interlocutory matter in a pending suit and the same question is presented in the identical manner to another justice of the same court considering another facet of the suit, the second justice should not overturn the ruling of the first justice. *State v. Infantolino,* 116 R.I. 303, 355 A.2d 722 (1976); *Rhode Island Ophthalmological Society v. Cannon,* 113 R.I. 16, 317 A.2d 124 (1974); *Goldstein v. Rhode Island Hospital Trust National Bank,* 110 R.I. 580, 296 A.2d 112 (1972).

Here, there was no violation of the law-of-the-case principle. The motion justice, in considering Martin's motion to attach, was following the dictates of Super.R. Civ.P. 4(j)(3), which specifies that a motion to attach is to be granted "only upon a showing that there is a probability of a judgment being rendered in favor of the plaintiff and that there is a need for furnishing the plaintiff security in the amount sought for satisfaction of such judgment, together with interest and costs." The motion justice made it perfectly clear that he was not determining the case on its merits but merely complying with the dictates of the rule. The motion justice was totally unaware that about two years later Martin's chief executive would concede at the trial on the merits that the corporation was looking only to Almonte and Fairway for payment for the hauling done in the summer of 1977.

Martin challenges the trial justice's conclusion in regard to the lack of any evidence indicating Fairway's ratification of Almonte's agreement with the hauler. The evidence it relies on is to be found in Fairway's counterclaim, in which it describes itself as a Delaware corporation doing business at 83 Greenwich Street and states that on or about July 1977 it "communicated with Martin in regard to the rigging and transportation of certain industrial freezing equipment from Abington, Mass. to Providence, Rhode Island[,]" and went on to claim that the equipment was greatly damaged because of Martin's negligence. Fairway asked $2 million in damages.

Evidence of ratification need not be shown solely by a formal vote of the board of directors. For instance, it may be demonstrated by the initiation of a suit for specific performance of a preincorporation agreement, *K & J Clayton Holding Corp. v. Keuffel & Esser Co.,* 113 N.J.Super. 50, 272 A.2d 565 (1971), or by the interposing of a counterclaim alleging a claim against the

plaintiff based upon the contract set up in the complaint, 2A Fletcher, *Cyclopedia of the Law of Private Corporations,* § 776 at 522 (perm. ed. 1982). Consequently, we hold that Fairway, by pursuing its counterclaim, has ratified the actions of Almonte in his dealings with Martin.[2]

Finally, the trial justice is faulted for having "forced the plaintiff to rest its case," thereby preventing Martin from showing "the exact relationships" among all the defendants. The trial justice, in refusing to grant a continuance so that one of the rigging crew could testify concerning the events that occurred when the cargo was being unloaded on Greenwich Street, observed that a "mountain" was being made out of a "molehill" collection claim in which the only question was who hired the hauler.

As he began oral argument before us, Martin's counsel described his client as the victim of a shell game. These remarks at trial and argument time indicate that Martin's counsel apparently misconceives the thrust of this litigation. Neither we nor the trial justice is being confronted with a claim that seeks to set aside a fraudulent conveyance. This controversy, as noted above, involves a claim for money due. The claimant has as yet not been paid. The judgment that has been entered in this case will be modified so that it will be against Fairway and Almonte. An award of a monetary judgment is one thing, but satisfaction of such a judgment is another matter. At this point in time, the judicial branch of our government can do no more. It might be that when an execution is issued, it will be satisfied.

The plaintiff's appeal is sustained, the judgment appealed from is vacated, and the case is remanded to the Superior Court for entry of a judgment in conformity with this opinion.

SHEA, J., did not participate.

2. We have held on several occasions that an agent acting on behalf of a disclosed principal is not personally liable to a third party for acts performed within the scope of his authority.

Here, however, Almonte has seen fit not to take a cross-appeal to raise this issue in the event that the trial justice had found liability on behalf of Fairway.