Joseph M. TOMAINO et al.

v.

CONCORD OIL OF NEWPORT, INC.,
a Massachusetts Corporation.

No. 95–684–Appeal.

Supreme Court of Rhode Island.

March 25, 1998.

Joseph R. Palumbo, Jr., Middletown, for Plaintiff.

Paul S. Callaghan, Kenneth P. Borden, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, FLANDERS and GOLDBERG, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case comes to us on cross-appeals from a judgment entered in Superior Court. The plaintiffs' complaint sought declaratory relief, injunctive relief, and money damages on the issue of ownership of certain underground gasoline tanks located on three separate parcels of land owned by the plaintiff Joseph M. Tomaino (Tomaino or plaintiff).[1] For the reasons set forth below, we affirm in part and reverse in part. The facts insofar

---

1. Tomaino is the settlor and trustee of coplaintiff Fox Hill Realty Trust, a revocable inter vivos · trust.

as are pertinent to the instant appeal are as follows.

In 1976 Tomaino became a 25–percent owner of Concord Oil Company (Concord), a closely held Massachusetts corporation involved primarily at that time in the home-heating-oil business. Tomaino, who brought with him seventeen years of experience from his previous employment with Texaco, Inc., became a member of the board of directors and vice president of Concord. His primary area of responsibility with Concord was the development, maintenance, and enhancement of Concord's retail-gasoline business.

The president of Concord was Arthur R. Bethke (Bethke), who along with his wife, Virginia, and two sons, Charles and Douglas, owned the rest of the Concord stock. Bethke, from the time he acquired the business in 1969, ran the company.[2]

Between 1976 and 1978 Concord developed several gasoline retail outlets. Because of its limited liquid capital and other business considerations, Concord would as a general rule either lease its service-station locations and/or negotiate a supply contract with an existing operator. Regardless of the form of the business, it was routine for Concord to acquire ownership of the underground tanks at each location where it was supplying gasoline.[3] This practice was standard operating procedure in the retail-gasoline industry in New England at that time. Three witnesses in the business of gasoline retailing, Arthur DeBlois III, president of DB Companies, Incorporated; Steven B. Shaer, principal and executive vice president of Mutual Oil Company Incorporated; and James Ahern, president of Drake Petroleum Company, testified that during the 1970s it was very common for gasoline distributors to own the underground tanks and related petroleum-marketing equipment (that is, underground fuel lines, underground pump systems, gas pump is-

lands, and the like) at retail locations with which the distributor had a supply or a commission contract. Arthur DeBlois testified that by securing ownership of the gasoline storage tanks, the supplier could "put a lock on [the] business through [the] contractual relationship." In addition, by owning the tanks, the supplier had the power to remove the equipment from the property in the event the onsite vendor was unable or unwilling to meet the supplier's business expectations. According to two of the witnesses this practice did not change until the mid–1980s, upon the advent of greater environmental-testing procedures and the consequent environmental liability, which was never an issue in the 1970s.

Prior to joining Concord, Tomaino had investigated the possibility of purchasing/leasing several retail gasoline businesses located in Rhode Island and owned by Newport Oil Corporation (Newport Oil). In 1978, after joining Concord, *Tomaino* and *Bethke* agreed that Tomaino would renew negotiations with Newport Oil in order to pursue jointly these opportunities on behalf of Concord. Tomaino negotiated an agreement with Newport Oil to lease three properties upon which retail-gasoline businesses were in operation. Specifically the locations were Two Carol Avenue, Newport (Newport); One Mile Corner, Middletown (One Mile Corner); and 2311 West Main Road, Portsmouth (Portsmouth).[4]

Tomaino and Bethke formed a separate corporation, Concord Oil of Newport, Inc. (Concord/Newport), a subsidiary of Concord and defendant here, to supply and/or operate the retail-gasoline businesses at each location. Ownership of Concord/Newport was as follows: Concord owned 68 percent of the stock and Tomaino owned 32 percent.[5] Tomaino served as president of the new entity, Bethke served as treasurer, and Mrs. Bethke was appointed clerk. Tomaino created a re-

---

**2.** The ownership of Concord stock was as follows: Tomaino (vice president), 25 percent; Arthur Bethke (president), 33 percent; Virginia Bethke (treasurer), 33 percent; the Bethkes' two sons, Charles and Douglas, 9 percent.

**3.** Tomaino testified that Concord or Concord/Newport owned the petroleum-marketing equipment in the majority of such situations.

**4.** Hereinafter we may refer to the subject locations collectively as "the properties."

**5.** Tomaino testified that dividing the new corporation in this manner allowed the Bethkes ultimately to retain 51 percent majority control over Concord's holdings.

vocable inter vivos Massachusetts business trust, Fox Hill Realty Trust (Fox Hill), of which he was the settlor, naming his children as beneficiaries. Fox Hill entered into a ten-year lease for each of the locations with Newport Oil.[6] By separate purchase-and-sale agreement executed March 23, 1978, Fox Hill purchased all the buildings and improvements constituting the gasoline service stations, including all petroleum-marketing equipment, underground tanks, and ancillary facilities at the price of one dollar.[7]

On June 12, 1978, Fox Hill transferred ownership, by bill of sale, of the underground tanks, pump islands, pump systems, and related lighting at each location to Concord/Newport for $5,000. Tomaino testified that this figure was below market value for the tanks and other improvements. There was additional testimony that this amount was substantially less than Concord/Newport had paid on previous occasions for similar acquisitions. The tanks became corporate assets of Concord/Newport and were depreciated on its income tax returns over the next five years.

Subsequently Concord/Newport paid for major retrofitting and renovation work on the tanks and underground pumping systems at two of the three Concord/Newport locations. In the 1980s the Rhode Island Department of Environmental Management began requiring owners of underground storage tanks to register them with the state. The tanks were registered with Concord/Newport listed as owner. Concord/Newport also provided and paid for tank inspection. In the mid–1980s, Bethke, Tomaino, and Michael T. Whaley, an officer and comptroller of Concord, discussed the necessity of purchasing environmental liability insurance on Concord- and Concord/Newport-owned underground tanks, including those located at the three subject properties. Concord/Newport, *not* Fox Hill, purchased all necessary insurance. Tomaino left Concord's employ in February 1993. Following Tomaino's departure, Concord/Newport continued to insure and maintain the tanks just as it had during Tomaino's tenure with the company.

George A. Giacobbi, a marketing representative for Concord from 1988 through 1994, testified that after Tomaino left in 1993, he (Giacobbi) attended a meeting with Bethke and Mark Daggis, a representative from Dairy Mart—the business occupying the Newport location. Giacobbi testified that Bethke offered to sell the underground tanks to Dairy Mart. Giacobbi also testified that he was present on another occasion when Greg Caneb, a Concord employee, offered to sell the tanks to other representatives from Dairy Mart.

In May 1993 Concord/Newport notified Tomaino of its intention to quit its tenancy at the One Mile Corner location. Tomaino requested that Concord/Newport remove its underground tanks at that site. After Concord/Newport failed to do so, Tomaino, after notifying Concord/Newport of his intention, removed the tanks at a cost of $18,600.

Frank M. Oliveira (Oliveira), a commercial real estate broker engaged by Fox Hill to rent the property testified that the presence of the tanks frustrated his efforts because suitable tenants were unwilling to assume the potential liability that the presence of the tanks created. Rhode Island Pizza, Inc., a franchisee of Domino's Pizza (Domino's), eventually agreed to rent the premises on the condition that the tanks be removed. Thereafter Tomaino paid for the removal of the tanks at the One Mile Corner location. When Domino's finally assumed tenancy, the property had been unoccupied for eleven and one-half months. Oliveira's undisputed testimony was that the fair rental value of the One Mile Corner property at that time was $3,000 per month triple net.[8]

6. In 1988 upon the termination of the Fox Hill–Newport Oil leaseholds Tomaino in his individual capacity purchased the subject properties from Newport Oil.

7. Tomaino testified that such an apparent bargain was justified owing to the value Newport received on the lease itself. This arrangement also was consistent with Newport Oil's accounting plan.

8. Oliveira testified that a "triple net" lease meant, in this case, that the lessor (Fox Hill) would receive $3,000 and the lessee, in this case Domino's, would have the additional responsibility of paying all additional expenses associated

On February 3, 1994, plaintiff filed a complaint seeking declaratory relief, injunctive relief, and money damages. In August 1994 Tomaino received further notice from Concord/Newport of its intention to terminate its tenancy at both the Portsmouth and the Newport locations. Concord/Newport removed a portion of the petroleum marketing equipment from each location, but did not remove the underground tanks or the related piping. Tomaino did not, however, remove at his own expense the tanks at either the Newport or the Portsmouth locations. Tomaino was unsuccessful in renting either of these two properties from that time until the time of trial.

A trial was held in Superior Court in June 1995. The trial justice denied defendant's motion for judgment as a matter of law. The jury determined that the tanks were the property of defendant Concord/Newport and awarded plaintiff $88,950 in damages, representing costs incurred in removing two tanks from one location and for lost rental revenue at each additional location. The trial justice denied defendant's motion for a new trial and directed defendant to remove the remaining underground tanks and related equipment. The trial justice conditioned the denial of defendant's motion upon plaintiff's acceptance of a remittitur of $37,650. The remittitur was imposed because the trial justice concluded that Tomaino had failed to mitigate damages by not removing the remaining tanks located at the Newport and the Portsmouth locations and thus render those properties eligible for lease or sale.

In support of its appeal defendant raises three issues. First, it claims that because the sale of the underground tanks was never authorized, approved, or ratified by its directors or shareholders, the trial justice erred in denying its motion for judgment as a matter of law since the sale was not binding upon the corporation. Second, Concord/Newport challenges the trial justice's instructions to the jury on the issues of ratification and fairness in respect to the sale of

the tanks from Fox Hill to Concord/Newport. Third, defendant claims that the trial justice erred in failing to order a remittitur reducing the award of damages for lost rent at the One Mile Corner location. Remittitur, defendant maintains, was warranted because of plaintiff's failure to mitigate damages as required by law.

Tomaino raises a single issue in support of his appeal, namely, that the trial justice erred in concluding that his failure to remove the tanks at the Portsmouth and the Newport sites constituted a violation of his duty to mitigate damages warranting a remittitur from the jury's award of damages.[9]

We shall address each of these issues in the order in which they were raised in the parties' briefs. Any additional facts necessary to the resolution of the issues will be discussed in the balance of the opinion.

## Judgment as a Matter of Law

 A trial justice, in considering a motion for judgment as a matter of law, must view the evidence in a light most favorable to the nonmoving party and draw all reasonable inferences therefrom in that party's favor without weighing the evidence or assessing the credibility of the witnesses. *Pantalone v. Advanced Energy Delivery Systems, Inc.,* 694 A.2d 1213, 1216 (R.I.1997). We employ an identical standard when reviewing a trial justice's grant or denial of such a motion. *Cinq–Mars v. Rodriguez,* 674 A.2d 401, 405 (R.I.1996). If, after applying this standard to the evidence, the trial justice concludes that "the evidence permits only one legitimate conclusion in regard to the outcome," he or she should grant the motion. *Long v. Atlantic PBS, Inc.,* 681 A.2d 249, 252 (R.I. 1996). However, if reasonable minds could disagree about the state of the evidence when viewed in this light, the nonmoving party is entitled to have the jury determine the issue, and the trial justice must deny the motion. *AAA Pool Service & Supply, Inc. v. Aetna Casualty and Surety Co.,* 479 A.2d

with that property, including maintenance costs, taxes, and insurance.

**9.** The plaintiff set forth three variations of this claim. We have distilled these to reflect what is

plaintiff's essential challenge to the proceedings below. In any event our decision obviates any necessity to address additional issues.

112, 115 (R.I.1984). The defendant insists that the trial justice erred in denying its motion for judgment as a matter of law.[10] We disagree.

Under Massachusetts law directors or officers of a corporation owe to that corporation the duties of care and loyalty. *Demoulas v. Demoulas Super Markets, Inc.,* 424 Mass. 501, 677 N.E.2d 159, 179 (1997); *see Geller v. Allied–Lyons PLC,* 42 Mass. App.Ct. 120, 674 N.E.2d 1334, 1336–37 (1997) (collecting cases).[11] Shareholders in a closely held corporation, who often also act as that corporation's directors and officers, owe one another the same fiduciary duties as partners owe to one another. *Zimmerman v. Bogoff,* 402 Mass. 650, 524 N.E.2d 849, 853 (1988); *Wilkes v. Springside Nursing Home, Inc.,* 370 Mass. 842, 353 N.E.2d 657, 661 (1976) (quoting *Donahue v. Rodd Electrotype Co. of New England, Inc.,* 367 Mass. 578, 328 N.E.2d 505, 515 (1975), explaining that duty to be one of " 'utmost good faith and loyalty.' ").[12] Rhode Island has recently adopted a similar rule in *A. Teixeira & Co. v. Teixeira,* 699 A.2d 1383, 1387 (R.I.1997).

The duty of loyalty requires, inter alia, that a director or an officer act in good faith toward the corporation and that transactions or contracts into which he or she enters with the corporation be fair to the corporation. *Dynan v. Fritz,* 400 Mass. 230, 508 N.E.2d 1371, 1377–78 (1987). Good faith in this context means full and honest disclosure by the fiduciary of all material facts to allow for a disinterested decision maker to exercise its informed judgment. *Id.* 508 N.E.2d at 1378; *see Geller,* 674 N.E.2d at 1338 ("sotto voce indications do not fulfill a fiduciary's duty of full disclosure of self-dealing"). Fairness to the corporation requires that a transaction or contract benefit the corporation and the stockholders thereof and not confer undue or unjust advantage on the

fiduciary. *Winchell v. Plywood Corp.,* 324 Mass. 171, 85 N.E.2d 313, 317 (1949).

An interested transaction occurs when a corporate fiduciary (officer, director, or in the case of a close corporation, a shareholder) enters into a contract or transaction with that corporate entity that he or she serves as a fiduciary. *See generally Winchell,* 85 N.E.2d at 316–17 (discussing Massachusetts precedent involving fiduciary self-dealing). Such a transaction is not per se voidable but may be challenged if it was not entered into in good faith and/or was unfair to the corporation. *Cooke v. Lynn Sand & Stone Co.,* 37 Mass.App.Ct. 490, 640 N.E.2d 786, 791 (1994). When a conflict of interest exists in a transaction or contract between an individual and the corporation of which he or she is an officer or a director, such contract or transaction may be avoided or ratified by the directors and stockholders, *Winchell,* 85 N.E.2d at 317, and the courts will "vigorously scrutinize the situation." *American Discount Corp. v. Kaitz,* 348 Mass. 706, 206 N.E.2d 156, 160 (1965).

To be valid, the transaction must have been assented to by the disinterested officers and/or stockholders of the corporation with full knowledge of all the facts. *See Winchell,* 85 N.E.2d at 316–17. The burden of proving that the challenged transaction both was fair to the corporation and was authorized, approved, or ratified lies with the interested party. *Id.* at 317. Ratification need not, however, be by formal vote but may be implied from a corporation's course of conduct in instances in which the corporation derives a benefit from the challenged contract or transaction and in which the directors had "knowledge of such facts or circumstances as would put a reasonable person on inquiry and [which] would lead to full discovery." *Puritan Medical Center, Inc. v. Cashman,* 413 Mass. 167, 596 N.E.2d 1004,

---

**10.** A motion for judgment as a matter of law was formerly known as a motion for directed verdict prior to the 1995 amendment to Rule 50 of the Superior Court Rules of Civil Procedure.

**11.** The parties have raised no issue in regard to choice of law and in their briefs rely primarily on Massachusetts law as it relates to this substantive issue. We therefore do likewise.

**12.** Chief Judge Cardozo's eloquent elaboration on this subject bears remembering:

"Joint venturers, like copartners, owe to one another * * * the duty of the finest loyalty * * * [n]ot honesty alone, but the punctilio of an honor the most sensitive." *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (1928).

1008 (1992) (quoting *Ingalls Iron Works Co. v. Ingalls,* 177 F.Supp. 151, 162 (N.D.Ala. 1959)); *see, e.g., Perkins v. Rich,* 11 Mass. App.Ct. 317, 415 N.E.2d 895, 898 (1981) (quoting *Kelley v. Newburyport & Amesbury Horse R.R.,* 141 Mass. 496, 6 N.E. 745, 748 (1886), "one cannot 'purposefully shut his eyes to means of information within his own possession and control' * * * having only that knowledge 'which he cares to have' "); *Juergens v. Venture Capital Corp.,* 1 Mass. App.Ct. 274, 295 N.E.2d 398, 401 (1973) (explaining that corporate fiduciaries are obligated to keep themselves informed about company business and may not avoid the consequences of a contract or transaction when knowledge of it is available to the directors and thus imputable to them); *accord A.A. Martin Transportation Co. v. Almonte,* 468 A.2d 268, 271 (R.I.1983).

The Supreme Judicial Court's decision in *Winchell* is the seminal Massachusetts case on fiduciary self-dealing and controls our analysis in the instant case. In *Winchell* the plaintiff, an officer, director, and shareholder of the defendant, a small closely held corporation, entered into a stock-repurchase agreement with the corporation whereby the corporation agreed to buy back from the plaintiff his shares upon tender in the amount of "the book value as shown on the books of the account [of the defendant] on the last day of the month preceding such tender." *Winchell,* 85 N.E.2d at 314. When the corporation refused to purchase said stock upon the plaintiff's tender of same, the plaintiff brought a suit in equity, seeking specific performance on the repurchase agreement. *Id.* at 315. The corporation argued that the president of the corporation, who entered into the contested agreement on behalf of the corporation, was not possessed of the requisite authority to bind the corporation in this manner, and the court agreed. *Id.* The court also found that the stockholders had not ratified the contract. *Id.* at 316. The court concluded that the evidence was such that "it could have been found that" the disinterested directors had ratified the contract in that they were apprised of its contents and had participated in its execution. *Id.*

In considering the fairness of the contract to the corporation, the court held that the contract had "all the earmarks of an arms-length bargain." *Id.* at 317. Specifically the court relied on the fact that (1) the plaintiff's interest in the contract was not adverse to the corporation, (2) at the time it was made, the contract was mutually advantageous to both the plaintiff and the defendant, (3) the agreement was not uncommon, and (4) had the same agreement been made with a disinterested third-party, "its validity could not be doubted." *Id.* The court explained that the fairness of the contract to the corporation must be evaluated at the time the agreement was entered into and not at the time that the plaintiff later tendered his shares. *Id.* at 318. The fact that the value of the plaintiff's shares was substantially greater at the time of tender than was the case at the time the contract was made "was entirely fortuitous" and amounted to nothing more than the natural and expected fluctuation of the marketplace and not to a foreseeable windfall to the plaintiff. *Id.* at 317.

■ It is important to appreciate that what lies at the heart of the instant dispute is less a question of whether a valid transfer occurred than one concerning a significant change in perception, between the time the transaction was effected and the time plaintiff filed suit, about whether an underground gasoline storage tank constitutes an asset or a liability. In the case at bar the evidence warranted a jury in finding that a transaction had been consummated transferring ownership of the petroleum-marketing equipment in issue from Fox Hill to Concord/Newport in 1978 for the price of $5,000. Applying the teachings of *Winchell* as well as other applicable Massachusetts precedent discussed above persuades us that the trial justice was correct in denying defendant's motion for judgment as a matter of law. A reasonable jury could have determined that the sale of the tanks conferred a benefit to the corporation, was not uncommon in the industry or in the usual course of Concord's business, was arguably fair to Concord/Newport at the time of sale, and had the sale been effected by a third party, its validity could not have been doubted.

The defendant pressed the position at oral argument that under Massachusetts law a close corporation, like Concord or Concord/Newport, could not enter into any transactions with its officers, directors, or principal shareholders either without formal authorization of disinterested directors/officers or by vote of the disinterested shareholders. Further, defendant maintained that under the law of Massachusetts, Bethke did not have the authority to bind Concord or Concord/Newport to this transaction despite the fact that the testimony at trial established that much of the business conducted by Concord and Concord/Newport was done without observance of the formalities defendant insists are necessary.

Although we acknowledge that a corporate officer's authority is "extremely limited" under Massachusetts law, *Johnson v. Witkowski*, 30 Mass.App.Ct. 697, 573 N.E.2d 513, 520 (1991), we do not agree that Massachusetts law compels the sort of punctilious corporate behavior defendant suggests. We decline to hold that Bethke, as president of Concord Oil, the majority shareholder of Concord/Newport, lacked the authority to authorize a routine $5,000 acquisition on behalf of Concord.

Actions taken without the observance of corporate formalities have "frequently been held to bind shareholders," especially when the rights of creditors or other outsiders are not involved. *See Pitts v. Halifax Country Club, Inc.*, 19 Mass.App.Ct. 525, 476 N.E.2d 222, 228 (1985) (citing *Samia v. Central Oil Co. of Worcester*, 339 Mass. 101, 158 N.E.2d 469, 474 (1959)); *Trager v. Schwartz*, 345 Mass. 653, 189 N.E.2d 509, 512 (1963) (explaining that small family-owned close corporations "conducted without overemphasis on corporate formalities * * * not to be held to strict standards of larger commercial organizations"). Dedication to form over substance might tend to extinguish the effective decision-making ability of small businesses when relatively minor corporate action ought be taken with the swiftness and ease necessary to keep pace with an ever-changing marketplace. Trial testimony revealed that other than the formal origination of the Concord/Newport corporate entity, little else that was accomplished by either corporation, including the numerous other tank acquisitions, was undertaken with anything greater than informal, at times tacit, agreement between the two true principals, Bethke and Tomaino. The evidence therefore warranted a reasonable jury to conclude that a majority of disinterested shareholders of Concord/Newport, namely, Concord, which was controlled by Arthur Bethke, or a majority of disinterested directors ratified the sale after full disclosure of all material facts. Alternatively the jury could have justifiably inferred ratification from Concord/Newport's course of conduct (that is, its insuring of the tanks, payment to Fox Hill of $5,000 for the tanks, inspection of the tanks, its prior practice of purchasing other underground tanks, and the like). Ratification in this manner was in fact consistent with the understandably informal way in which Bethke and Tomaino directed the course of corporate business in nearly every respect.

The defendant argues that the evidence adduced by plaintiff on the issue of authorization, approval, or ratification was insufficient as a matter of law such that no reasonable jury could have found on behalf of plaintiff. We disagree. The evidence was sufficient to raise a jury issue. The defendant's evidence was diametrically opposed to plaintiff's. The jury had to make a credibility determination in respect to whether Tomaino or Bethke was telling the truth.

Tomaino testified that he had a detailed discussion with Bethke concerning the sale of the tanks to Concord/Newport. He also testified that at some point prior to the final incorporation of the new entity, Concord/Newport, he attended a meeting with Arthur Bethke, his wife, Virginia and the two Bethke children. The subject matter discussed at that meeting was the formation of the subsidiary corporation. Further, Tomaino related how over the ensuing fifteen years (1978 to 1993), he and Bethke discussed the tanks on numerous occasions but always from the context of Concord/Newport's ownership responsibilities toward them. Tomaino also presented testimony demonstrating that Concord/Newport, *not* Fox Hill, insured, paid for inspection of, and depreciated on its

tax returns the tanks. Also, Tomaino produced a copy of the bill of sale purportedly memorializing the transaction in addition to a Concord/Newport check in the amount of $5,000, paid to Fox Hill on June 12, 1978, the very day that the bill of sale for the tanks was executed. The notation on the check indicated that the proceeds constituted payment for "tanks and lights, see bill of sale" and was in the handwriting of Michael Whaley, Concord/Newport's comptroller. The jury was entitled to consider this evidence and make its determination concerning credibility. The jury would have been justified in questioning why defendant, through its officers including Bethke, would have conducted itself in such a manner over the course of so many years if it did not own the tanks.

Bethke, in testimony in marked contrast to Tomaino's testimony, asserted that he *specifically* recalled never having any such discussions in 1978 or at any other time regarding ownership of the tanks. On cross-examination, however, Bethke was impeached by his prior deposition testimony under oath wherein his disavowal was more equivocal on this issue.[13] Simply put, the jury believed Tomaino.

The defendant argues that even had the sale of the tanks been ratified by Concord/Newport, the deal was not mutually beneficial or fair to the corporation. In support of this assertion it points to the discrepancy between the price Fox Hill paid for the tanks and equipment and the price Concord/Newport paid for just a portion thereof. Further, defendant insists that the testimony adduced by plaintiff that it was standard practice within the industry for gasoline suppliers to purchase the underground tanks of retail vendors to whom they supplied gasoline is not persuasive on the facts of this case. Concord/Newport, the argument went, had no need to "lock in" Tomaino/Fox Hill because Tomaino was in effect Concord/Newport, owning 32 percent of that company's stock. Concord/Newport maintains that it would be ludicrous to conclude that it would

seek to lock Tomaino into a gasoline-supply contract.

We find these arguments interesting but ultimately unavailing. As an initial matter we note that these were issues for the jury to decide. The markup on the price of the improvements from Fox Hill to Concord/Newport is not so shocking in context as the seemingly stark inequity of the increase considered in the abstract. After all, trial testimony established that this amount was below market value and substantially less than what Concord or Concord/Newport had paid for similar acquisitions on previous occasions. Examining the dynamics of all the transactions involved, the jury could reasonably conclude that the difference in price was attributable to business judgment, arm's-length negotiation, or some other justification and did not represent a hidden windfall to Tomaino. Moreover, this $5,000 transaction placed in the context of Concord's and Concord/Newport's financial landscape was slight: testimony at trial revealed that in retail-gasoline business alone, the corporations together supplied gasoline to over thirty service stations throughout New England.

Nonetheless Concord/Newport argues that its established practice in respect to past acquisitions of petroleum-marketing equipment should be ignored because with Tomaino on both sides of the transaction, this situation was different. The jury was entitled to disagree. Prior to Tomaino's joining Concord, the corporation had supply contracts with just two retail-gasoline businesses, one of which was owned by a real estate trust, Musterfield Realty Trust. Arthur Bethke was the settlor and alter ego of Musterfield. Concord, however, was the owner of the underground tanks located at the service station owned by Musterfield. Also, as of the time of trial Concord Oil leased two retail-gasoline sites, one in Merrimack, New Hampshire, and the other in Clinton, Massachusetts, from a partnership comprising of Tomaino and Bethke. It is significant that the underground gasoline-storage tanks at these facilities were owned

---

13. At his deposition, when asked whether "there [had been] any discussion between you and him about ownership of the gasoline dispensing facilities at each of these properties?" Bethke testified, "Yeah, I think—I'm not even quite sure if we even ever owned those things. * * * I honestly don't know if we owned those things."

by Concord. We are of the opinion that these corporate actions demonstrate Concord's allegiance to standard operating procedure better than the unsubstantiated, abstract arguments advanced by defendant on appeal. Our review of the record reveals adequate justification for the jury to have concluded that Concord/Newport had reason to purchase the tanks despite the involvement at that time of Tomaino as a shareholder and officer of Concord/Newport.

Upon defendant's motion for judgment as a matter of law, the trial justice was compelled to view the evidence in the light most favorable to Tomaino. *Cinq–Mars,* 674 A.2d at 405. Viewing the evidence and all reasonable inferences therefrom in a light most beneficial to plaintiff, the trial justice properly determined that a jury question existed concerning whether (1) full disclosure of the material facts concerning the tank transaction had been made by plaintiff to Concord/Newport, (2) the sale had been approved, authorized, or ratified by Concord/Newport, and (3) the transaction was fair to Concord/Newport at the time of authorization, approval, or ratification. Accordingly we discern no error in the trial justice's denial of defendant's motion for judgment as a matter of law.

### Jury Instructions

Concord challenges the trial justice's instructions to the jury on the issue of Concord/Newport's authorization, approval, and/or ratification of the sale of the underground tanks from Fox Hill to Concord/Newport. The defendant argues that the trial justice's instructions were internally contradictory and contrary to Massachusetts law as well as Concord/Newport's own corporate by-

laws.[14] The trial justice instructed the jury as follows:

"If you find that the transactions between Joseph Tomaino and/or Fox Hill Realty Trust were consummated in violation of the corporate bylaws regarding intercompany transaction[s], the failure of Arthur Bethke and the other directors and other stockholders to detect the violation does not constitute authorization, approval or ratification.

"Evidence of ratification need not be shown solely by a formal vote of the board of directors, but can be inferred by a course of conduct.

"[I]f you find there was a sale of underground storage tanks by Fox Hill Realty Trust to Concord Oil of Newport carried out by Mr. Tomaino in 1978, that sale is not voidable so long as the material facts were known to the majority shareholder of Concord Oil of Newport and was approved or ratified by the majority shareholder, or if the sale was fair to the corporation as of the time it was approved or ratified by the stockholders of Concord Oil of Newport."

We recognize that the legal and factual issues in the case at bar were somewhat complex, a condition complicated by the convoluted organizational structures and relationships of the corporate entities involved. Nevertheless, it is "axiomatic that the trial justice [is] obliged to instruct the jury with precision and clarity with respect to the rules of law applicable to the issues raised at trial." *Armstrong v. Polaski,* 117 R.I. 565, 568, 369 A.2d 249, 251 (1977). In reviewing the language of a challenged jury instruction, "we do not indulge in drawing metaphysical semantic distinctions." *Brimbau v. Ausdale Equipment Rental Corp.,* 440 A.2d 1292, 1298

---

14. Concord's bylaws provide in pertinent part:

"No contract or transaction between the corporation and one or more of its directors or officers * * * shall be void or voidable * * * if:

(a) The material facts as to his relationship and as to the contract or transaction are disclosed or are known to the Board of Directors or the committee which authorizes, approves or ratifies the contract or transaction, and the Board or committee in good faith authorizes, approves or ratifies the contract or transaction by the affirmative vote of a majority of the disinterested directors * * *; or

(b) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically authorized, approved or ratified in good faith by a vote of the stockholders; or

(c) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the Board of Directors * * * or the stockholders."

(R.I.1982). Instead we consider the manner in which the instruction "would be interpreted by a jury composed of ordinarily intelligent lay persons listening to it at the close of the trial." *State v. Reid,* 101 R.I. 363, 366, 223 A.2d 444, 446 (1966). Employing this standard in analyzing the error claimed leads us to conclude that the trial justice's instruction on this issue was adequate.

■■■ Pursuant to Rule 51(b) of the Superior Court Rules of Civil Procedure, a party seeking to challenge a trial justice's instructions must, as a prerequisite to appellate review, apprise the trial justice of the alleged error with specificity in order to allow him or her an opportunity to correct the error, if any, before the jury begins its deliberations. *See DiFranco v. Klein,* 657 A.2d 145, 147 (R.I.1995). Defense counsel's objection raised at trial in respect to the challenged instruction was the trial justice's reference to "the majority shareholder of Concord Oil of Newport." Defense counsel argued that there was no single majority shareholder or even a majority *disinterested* shareholder of Concord/Newport. We disagree. Concord was the majority shareholder of Concord/Newport, holding 68 percent of Concord/Newport's shares while Tomaino individually owned the remaining 32 percent. Our review of the instruction as given convinces us that no confusion or misinterpretation on the part of the jury was likely to have resulted. Bethke could have been found to be the alter ego of Concord.

The defendant reiterates its Rule 50 arguments here, specifically, (1) that there was insufficient evidence to warrant instructing the jury on implicit ratification and (2) that the sale had not been authorized by either Concord/Newport's directors or its shareholders. However, as we discussed at some length above, these arguments were for the jury. The evidence was sufficient to warrant a jury determination of these issues, and we are persuaded that the trial justice's instructions adequately conveyed the legal principles to which the jury's findings of fact should be applied.

## Remittitur

The plaintiff challenges the trial justice's decision to order a remittitur of $37,650 from the jury's award of $88,950 upon the trial justice's conclusion that Tomaino had failed to mitigate damages in respect to the claimed lost rental revenues of the Portsmouth and the Newport properties. Conversely, defendant challenges the trial justice's decision not to reduce similarly the jury's award of damages for lost rent at the One Mile Corner location.

■■■ We have held that when a trial justice reduces a jury verdict as being "grossly excessive," we shall not disturb that judgment unless the trial justice was clearly wrong, overlooked or misconceived material evidence, or applied an erroneous rule of law to the evidence. *See Floyd v. Turgeon,* 68 R.I. 218, 232, 27 A.2d 330, 337 (1942). Thus a trial justice, in reducing a verdict or conditioning the denial of a motion for new trial on a plaintiff's assent to a reduction in the amount of damages awarded, should reasonably indicate with particularity that portion of the jury's award that is excessive and warrants a remission of excess. *Devine v. United Electric Railways Co.,* 85 R.I. 170, 172–73, 128 A.2d 334, 335 (1957).

■■■ In its answer to plaintiff's original complaint, defendant raised the affirmative defense of failure to mitigate damages, sometimes referred to as the "doctrine of avoidable consequences." Under Rhode Island law a party claiming injury that is due to breach of contract or tort has a duty to exercise reasonable diligence and ordinary care in attempting to minimize its damages. *Bibby's Refrigeration, Heating & Air Conditioning, Inc. v. Salisbury,* 603 A.2d 726, 729 (R.I.1992). This rule prevents the injured party from sitting silent while the damages accumulate. *Id.* It is important to differentiate between the legal duty to mitigate and actual success in mitigation. The law commands reasonable efforts and ordinary care in the circumstances, *see Fleet National Bank v. Anchor Media Television, Inc.,* 45 F.3d 546, 561 (1st Cir.1995), not Herculean exertion. Moreover, although the law places a duty to mitigate upon the party claiming injury, failure to do so does not create liabili-

ty; that party is simply prohibited from recovering that amount of damages he or she could have reasonably avoided. *Bibby's,* 603 A.2d at 729. However, the defendant has the burden of proving that the plaintiff was delinquent in executing this duty. *Id.*

 Concord/Newport did not present any evidence at trial regarding its allegation that plaintiff failed to mitigate damages, nor did it present any evidence whatsoever that plaintiff's conduct was less than reasonable or that plaintiff was in a position to be capable of taking the action defendant insists was necessary.[15] Given the circumstances present in this case, it would arguably strain the boundaries of reasonableness to hold plaintiff to a duty to expend tens of thousands of dollars in order to remove defendant's property, especially when plaintiff had no tenants committed to either the Portsmouth or the Newport sites.

In any event the trial justice failed to instruct the jury on the issue of mitigation.[16] Whether the plaintiff failed reasonably to mitigate damages was a question, if warranted by the facts and properly pursued by the defendant, for the jury to decide. *See Enterprise Garnetting Co. v. Forcier,* 69 R.I. 455, 462, 35 A.2d 1, 4 (1943); *Noyes v. Whiting,* 289 Mass. 270, 194 N.E. 93, 94 (1935). By failing to instruct the jury on the issue of mitigation, the trial justice was bound by the law of the case as presented in his charge. He could not fault the jury for restricting its findings within the parameters of his instructions. *See Fox v. Allstate Insurance Co.,* 425 A.2d 903, 907 (R.I.1981) (in considering a motion for new trial, "[t]he trial justice must first consider all material evidence in the case *in the light of the charge to the jury* " (emphasis added)).

For the foregoing reasons, the defendant's appeal is denied, and the plaintiff's appeal is sustained. The remittitur is vacated. The papers in the case may be remanded to the Superior Court for entry of judgment in accordance with the jury's award of damages.

BOURCIER, J., did not participate.

---

15. Defense counsel cross-examined Oliveira on whether having the tanks remain in the ground at both the Portsmouth and the Newport properties allowed greater flexibility in seeking prospective tenants. Counsel suggested by his questions that the presence of the tanks might expand this potential market. The defendant asserts that this questioning implicitly raised the mitigation issue. We disagree. The cross-examination of Oliveira went to the issue of damages, not mitigation. If the jurors believed the defense's theory, they were free to find that the presence of the tanks was an added benefit and not award damages for lost rent.

16. Counsel for defendant did object to the trial justice's refusal to give several of defendant's requested instructions that counsel characterized as mitigation instructions. The trial justice overruled counsel's objection and refused to give the instructions. Our review of these instructions reveals that they were improper and erroneous in fact and law. Nevertheless, defendant has not appealed from the denial so to instruct, and thus we need not address this issue. *See F. Gilbane, Inc. v. Noel,* 87 R.I. 40, 41, 137 A.2d 531, 532 (1958) (per curiam).