[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This contract case is before the Court for decision following a non-jury trial on a one count complaint brought by Taylor Box Company (Taylor) against SAR Group, Ltd., D/B/A Raymond Audette Associates (Audette). Plaintiff seeks to recover damages from Audette relative to an order he placed with Taylor for the manufacture of 2,000 specialty DVD boxes. Jurisdiction is pursuant to General Law 1956, § 8-2-14.
 Facts
Taylor is a custom box manufacturing company which has been owned and operated by the family of Daniel J. Shedd for nearly one hundred (100) years. Located in Rhode Island, it employs between forty five (45) and eighty (80) employees. Taylor asserts that it has suffered damages as a result of a breach of a contract by Audette. Specifically, Taylor claims that in the spring of 2001, Audette entered into a binding contract with Taylor for the manufacture of two thousand (2,000) specialty order boxes designed to store DVD's utilized in corporate training kits.
The Plaintiff's case was in large part presented through the testimony of Daniel J. Shedd, the President and sole owner of Taylor. Shedd testified that on April 7, 2001, Defendant Audette came to the Taylor manufacturing facility for a meeting. The prearranged meeting was intended to further discussion concerning a project which Audette wished to discuss with the hierarchy of Taylor. Audette sat down with Shedd, Kenneth Burns, (Taylor's senior designer), Gene LaPlante, (a sales representative of Taylor), and perhaps a fourth individual. Audette brought to the meeting a box which was then being utilized by his customer for the transportation and storage of DVD recordings utilized for corporate training. Audette explained that he wished Taylor to design a replacement box which would be cheaper. A sample box which was then in use by Audette's client was provided to Burns to enable him to build a prototype replacement box that could be manufactured by Taylor.
As related by Shedd, Audette indicated that he was looking for "better value" in a DVD box and that he needed the product by mid-June. It is clear from this very first conversation that urgency was a central aspect of the project.
Over the next week, Taylor constructed a prototype replacement box which was given to Audette. (Exhibit 3). Following construction of the prototype, Taylor conducted a price analysis so as to determine cost, markup and Taylor's profit should a contract be finalized. In response to Audette's request, Taylor provided a quote (Exhibit 5) for certain quantities of the box. Subsequently, Taylor provided additional quotes relative to various other quantities pursuant to the request of Audette.
As had been previously discussed, the quotation for 2,000 boxes indicated that a $730 charge would be made for the creation of unique dies which would be needed to manufacture this particular box. After having received the prototype so that it could be shown to his customer, Audette submitted an order on May 15, 2001. That order (Exhibit 6) referenced Taylor's quotation, stated a 2,000 count production at $14.129 each, agreed to a $730 one-time set up charge, and indicated that there would be a lead time of approximately four to six weeks, a reference to the time period during which Taylor was expected to deliver the units. The order form, signed by Audette, indicated "order subject to approval of sample provided." Shedd testified that Audette subsequently advised Taylor that Audette's client had approved the prototype.
From the foregoing facts it might appear that a meeting of minds (and a contract) had been reached as represented by the quotation and order forms. Shedd and Taylor personnel believed that they had received a firm order from Audette. Accordingly, during the week of May 24, 2001, Taylor ordered the material needed to manufacture the two thousand (2,000) boxes. Shedd testified that he was aware of the time constraints placed on Taylor by Audette, that Audette had indicated his customer had approved the design, and that around May 20, 2001, Shedd had specifically advised Audette that the materials for the job "would be ordered." These materials are represented by the order forms and invoices contained in Exhibit 7.
The Defendant's testimony as to these events was substantially different. And, in sharp contrast to the direct and convincing testimony given by Shedd, this Court found the somewhat evasive and vague testimony of Audette to be highly suspect with respect to numerous points in contention.
Raymond Audette has been in the business of distributing recognition products for the past twenty-five (25) years. Although an apparently seasoned businessman, he has little if any background relative to the manufacture of specialty boxes. Audette testified that his introduction to Taylor was through LaPlante, a sales representative for Taylor. It was because of his contact with LaPlante that he met with Taylor officials in early April, 2001. Audette testified that he advised Taylor that he was looking to have a replacement box manufactured, similar to that which was introduced as Plaintiff's Exhibit 1. However, Audette (and apparently his client) needed one which was more affordable. In his initial meeting with Taylor, Audette explained that he wished Taylor to come up with a solution to his need for a less expensive box to be utilized for the storage and transportation of DVD's used for training programs sponsored for employees of Dunkin Brands, Inc., his long time customer.
At his second meeting at Taylor, Audette was provided with a prototype which had been manufactured by hand by the Taylor design staff headed by Kenneth Burns. Audette took custody of the prototype purportedly to show it to his customer for approval in order to move forward with the project. At that second meeting there was a discussion relative to the art work to be displayed on the exterior of the training kit box. Contrary to the testimony given by Shedd and Burns, Audette testified that it was his understanding that the project would go forward only after his customer received and approved a preproduction sample, not the hand-crafted prototype which had been produced by Burns.[1] Likewise, Audette testified that based upon a facsimile message which he had received from a Taylor employee (Exhibit A), he understood that nothing would be done on the project until (1) he provided Taylor with a 50% deposit for the production and (2) he had given "final approvals."[2] (Exhibit A). Audette testified that he never forwarded a check for 50% of the contract amount which he understood to be a requirement for a go-ahead of the project. (Exhibit C). Audette further testified that his customer never entered into contract with him for the production of boxes, a fact which he readily admitted he never disclosed to Taylor.
Despite his stated desire to move the project forward before the end of June 2001, Audette testified that he told LaPlante that the project was not going forward "at this time" when LaPlante made inquiry of him during the summer of 2001. The Court found this testimony somewhat perplexing in light of the fact that when billed for the $730 setup fee involving the production of special order dies, Audette readily paid the invoice. (Exhibits 9,10). Audette claimed at trial that approval of the project would only occur after his customer had approved art work to be displayed on the exterior of the training kit box. The subject art work had been discussed at length between Audette and Taylor personnel. And, the art work to be placed on the box was supplied to Taylor by Audette on an electronic disc. However, the precise placement of the art work (logos of the companies which would be the end users of the training kits) were to be reviewed by Audette and his customer.
Shedd testified that he and other Taylor Box personnel had ongoing conversations with Audette during June while Taylor awaited final approval of the art work and the receipt of monies from Audette. As Shedd recalls, during one of these conversations Audette indicated to Shedd that the planned delivery date of June 25 had "gone by the boards." Regardless, based upon comments made by Audette to Taylor, Shedd and the other Taylor personnel involved in the project believed that the project was still viable. This was certainly the only impression that could be derived from the fact that the specialty die order in the amount of $730 had been invoiced to Audette and subsequently paid.
By the end of June, Audette commented to Shedd that it was clear that the project would not be completed prior to the annual shut down of Taylor during early July. Audette indicated that he was "fine with that." Shortly after Taylor resumed its regular work schedule in mid-July, Audette indicated to Shedd that "the project was going forward but it was a budget issue with his client."
Understandably, Taylor personnel continued to believe that the project would go forward as Audette had repeatedly indicated. In fact, Audette never told anyone at Taylor that the project was dead. Accordingly, LaPlante was directed by Shedd to continue to maintain contact with Audette so that production could commence as soon as possible. Audette was not heard from again.
In October, Taylor sent Audette an invoice reflecting a "cancellation charge" for the project in the amount of $10,960.35. (Exhibit 13). Upon receipt of this invoice Audette called Taylor and spoke with Daniel Shedd. Audette indicated that he was not going to pay the invoice and that he had never given authority to go forward with the ordering of materials.
Claiming that no contract had ever been reached, Audette relies upon a telefacsimile which he received from Taylor office manager Bridget Malone on May 30, 2001, as well as the credit policy of Taylor. (Exhibits B, C). In essence, Audette asserts that because he never provided Taylor with all approvals necessary for the project (e.g., art work) and never submitted a check in the amount of 50% of the contract amount as required by Taylor's credit policy, the contract was never finalized.
 Discussion
Taylor seeks damages for breach of contract. Under this claim Taylor seeks the contract price for the production of two thousand (2,000) boxes plus salesman's commission of 10% and a profit of 15%. This totals approximately $28,000. Alternatively, Plaintiff seeks to be made whole for its damages as a result of its detrimental reliance upon Audette's statements and actions. Although not so stated, this is essentially a claim based on the doctrine of promissory estoppel.
A contract is a legally enforceable agreement between two or more entities. For a plaintiff to prevail on a straight contract theory, a plaintiff must prove the five essential elements of a contract which are: 1) an offer, 2) the acceptance of that offer, 3) consideration, 4) a mutual or reciprocal agreement, and 5) a mutual or reciprocal obligation. Taylor contends that terms expressly stated in the quotation provided to Audette together with Audette's order constitute a contract which is enforceable against Audette. Audette contends otherwise, claiming that he relied upon not only the terms of the quotation and the order in response thereto, but likewise the terms and conditions of Taylor's credit policy which Taylor had provided to him by separate documentation as well the assurances contained within the facsimile sent to him by Malone on May 30, 2001. Based on the evidence presented at trial the Court concludes that the contract as claimed by Taylor was not perfected. However, this Court's analysis does not stop there.
It is well-established that under certain circumstances a contract will exist even though there has been no consideration for the parties' agreement. Where one party relies to its detriment on a promise made by the other party, the promise operates as a substitute for consideration and the promise is enforceable. This is known as the doctrine of promissory estoppel.
From the very beginning of the negotiations between the Plaintiff and Defendant, it was made clear to the Plaintiff that the production of the box within a very short time period was imperative to Audette's client. Initially the project was to be finished by mid-June of 2001. While this date was moved back due to changes in artwork and budgetary matters, the project was still viable. Communications between the parties continued. In fact, Audette paid the invoice for the specialty dies ordered in apparent anticipation of the manufacture of the boxes. Taylor Box reasonably relied upon the assurances of Audette that the contract would go forward and incurred extensive expenses in reliance of those assurances.
In order for there to be an enforceable contract, certain long-recognized elements need to be established. "[C]ompetent parties, subject matter, a legal consideration, mutuality of agreement and a mutuality of obligation" must all be present for this court to enforce a contract. Rhode Island Five v. Medical Associates of Bristol,668 A.2d 1250, 1253 (R.I. 1996). Where, as here, these requirements are not strictly satisfied, the circumstances may require the court to find the Plaintiff entitled to relief on the basis of promissory estoppel.
Promissory estoppel creates a contract where otherwise there would be none when there is "a promise which promisor should reasonably expect to induce action or forbearance . . ." East Providence Credit Union v.Geremia, 239 A.2d 725, 727 (R.I. 1968) (citing at Restatement, Contracts, § 90 p. 110). Such a promise is "binding if injustice can be avoided only by enforcement of the promise." Id.
Three elements must be present for a court to enforce an otherwise unenforceable promise. There must be a clear and unambiguous promise made, the promise was reasonably and justifiably relied upon, the reliance caused the promisee to incur damages by relying on the promise, and the promise relied upon must induce the action that created the damages. B.M.L. Corp. v. Greater Providence Deposit Corp., 495 A.2d 675
(R.I. 1985).
Based upon the credible evidence this Court finds that in relying on the statements and actions of the Defendant, Taylor was reasonable in placing orders for materials which would be utilized for the specialty boxes to be manufactured within a very short time period. These materials are described in the invoices contained within Exhibit 7 and include: DVD tray sets furnished by Media Packaging and Design, Inc. in the amount of $3,784, box handles in the amount of $495 provided by Homa Locks, box materials in the amount of $1022.63 provided by Newman Co., Inc., box coverings in the amount of $1,309.03 provided by BCI Book Covers, Inc., art work proofs in the amount of $225 provided by RPI Printing, velcro fasteners in the amount of $170 provided by Dunlap Industries, Inc., and a manufacturing die provided by The Die Shop, Inc. in the amount of $110.
This Court found the testimony of Daniel Shedd and designer Kenneth Burns to be credible to the effect that Audette had given a "green light" in late May, 2001, for the ordering of materials to be utilized in the project. Taylor was entitled to rely on Audette's statements actions and acquiescence when it committed the expenditure of funds for the procurement of materials under the circumstances, particular in light of the very short time frame which Audette indicated he was operating under. Not only did this Court find much of Defendant Audette's testimony to be incredulous including that testimony given regarding his denial of any knowledge that materials were being ordered by Taylor, but this Court was impressed with the fact that Audette purposely destroyed all of his business files regarding these transactions subsequent to the commencement of this litigation. The several trial exhibits offered by both parties apparently came from the business records maintained by Taylor.
The doctrine of spoilation allows a court to render a decision on a matter despite missing or destroyed evidence in instances where the evidence is missing due to an action by one of the parties. "The deliberate or negligent destruction of relevant evidence by a party to litigation may give rise to an inference that the destroyed evidence was unfavorable to that party." For example, in Mead v. Papa RazziRestaurant, 840 A.2d 1103, 1108 (R.I. 2004) citing Tancrelle v. FriendlyIce Cream Corp., 756 A.2d 744 (R.I. 2000). The Courts will not allow a party to benefit from his own unexplained failure to preserve and produce relevant and necessary evidence during discovery or trial. This rule exists even when the evidence has been destroyed out of mistake or negligence. In Mead v. Papa Razzi Restaurant, the plaintiff was injured when she fell on a wet floor in the defendant's restaurant. The Corporate defendant had a policy in all of its restaurants which required an incident report to be prepared contemporaneous to any incidents occurring in the restaurants. In the case of a slip and fall, the report would contain the cause of the fall, an identification of any employees involved and the condition of the floor at the time of the incident. This report could not be found for production at discovery. The defendant did not know if the report had ever been produced, and if a report had been produced, what had happened to the report. Without any explanation of why such a report could not be found, the jury was allowed to infer that the production of such a report would have had adverse consequences to the defendant.
Here, Audette failed to produce any business records from his files regarding his communications with Taylor Box or his client relative to the project. Audette admits that he destroyed the evidence after proceedings had commenced against him. The business files that were destroyed could have included important evidence as to whether the defendant had given certain assurances to Plaintiff and the nature and status of the project as between Audette and his client. For example, what did the records show concerning Audette's notice to his client as to Taylor's ability to deliver the order before June 30? What did they show regarding Taylor's notification that materials were being ordered? What did they show as to Audette's intent when he made payment of the $730 in specialty die charges? The destroyed evidence is assumed to be adverse to the defendant's case. Thus, Audette's actions subsequent to the filing of the lawsuit against him are corroborative of the Plaintiff's position.
Finally, Defendant argues that Plaintiff failed to mitigate its damages by reselling or returning the special order materials which had been purchased in anticipation of manufacture. Under Rhode Island law a party claiming injury that is due to a breach of contract or tort "has a duty to exercise reasonable diligence and ordinary care in attempting to minimize its damages." Bibby's Refrigeration, Heating AirConditioning, Inc. v. Salisbury, 603 A.2d 726, 729 (R.I. 1992). This duty prevents an injured party from sitting idly while damages accumulate. Reasonable efforts must be made by the injured party to limit their damages. Tomaino v. Concord Oil of Newport, Inc., 709 A.2d 1016, 1026
(R.I. 1998) citing Fleet National Bank v. Anchor Media Television, Inc.,45 F.3d 546, 561 (1st Cir. 1995).
However, the burden of proof when failure to mitigate has been alleged "rests on the party claiming that another litigant has failed to mitigate damages." Saunders Real Estate Corp. v. Landry, 769 A.2d 1277 (R.I. 2001)citing Riley v. St. Germain, 723 A.2d 1120, 1123 (R.I. 1999); Bibby'sRefrigeration, Heating Air Conditioning v. Salisbury at 729. The defendant was unsuccessful at trial in his attempt to prove that the plaintiff did not act reasonably.
The testimony at trial showed that Taylor kept the project "alive" for about six months. By the fall of 2001, the return of the materials was unrealistic. Many of the items purchased were specialty items for this particular project. Some of the materials were of such modest value that the shipping costs may have made return impractical. After six months had passed, returns may no longer have been a possibility. Most importantly, Rhode Island law clearly places the burden of proof on the defendant to prove that the plaintiff could have avoided damages through reasonable efforts in mitigation. The Defendant did not introduce sufficient evidence to meet its burden in this regard. See Bibby's Refrigeration,Heating Air Conditioning, Inc. v. Salisbury, 603 A.2d at 729.
 Conclusion
This Court finds that although Plaintiff has failed to prove by a preponderance of the evidence that there was a meeting of the minds regarding the manufacture of 2000 specialty boxes, Defendant is liable to Plaintiff for damages suffered by Taylor as well as a reasonable profit/overhead expenses as a result of the extensive work performed by Plaintiff on the project. Taylor was clearly reasonable in relying on the statements and actions of Audette which prompted Plaintiff to: order materials, order specialty dies, plan for expedited factory production, and continue to spend substantial time and effort in liaison with Audette. Based on the evidence at trial, Defendant is estopped from claiming that there was no contractual relationship. Damages are determined to be $10,960.35.
 Counsel shall prepare and submit a Judgment for entry.
[1] This would seem to require, prior to a firm contract, a complete set up of the manufacturer's assembly line, hardly a reasonable requirement for this project.
[2] It is not clear to this Court which additional approvals were needed.